**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| JEFFREY B. COHEN, | * | |
| Plaintiff, | * | |
| vs. | | |
| | * | Civil Action No.  1:14-CV-00313-JFM |
| BANKERS STANDARD INSURANCE | | |
| COMPANY d/b/a ACE PRIVATE RISK | * | |
| SERVICES, | | **REDACTED VERSION** |
| | * | |
| Defendant. | | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BANKERS STANDARD INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

**Page**

I.  OVERVIEW ...........................................................................................................1

II.  STATEMENT OF FACTS ....................................................................................2

    A.  The Policy Precludes Coverage for Intentional Loss, Criminal Acts,
        Misappropriation, Fraud and Concealment............................................. 2

    B.  In the Months Prior to the Fire, Plaintiff Was Terminated from his Job,
        Lost His Insurance License, and Was Ordered to Pay $100,000 into the
        Registry of the Chancery Court of Delaware.......................................... 4

    C.  Plaintiff's Cooperfield Home Was in Disrepair and the Cohens Had
        Plans to Renovate, They Moved Out of the Home Shortly Before the
        Fire, and They Discontinued the Fire and Alarm System 6 Days Prior to
        the Fire. ................................................................................................... 8

    D.  Plaintiff Left the Cooperfield Home Only 20 Minutes Before the Fire
        Was Seen By a Neighbor, and Due to the Suspicious Circumstances,
        the Fire Was Referred to the Baltimore County Police Department's Arson
        Department............................................................................................. 10

    E.  Plaintiff Attempted to Implicate the Refrigerator in the Garage and/or
        Firecrackers as the Cause of the Fire, But the Baltimore County Police
        Department Concluded the Fire Was Intentionally Set.  He Then
        Contends a "John Doe" Who Allegedly Sent Him Some Emails
        Several Weeks Later May Have Caused the Fire. ................................... 11

        1.  Plaintiff Tries to Implicate the Refrigerator in the Garage as the
                Cause of the Fire. ................................................................... 11

        2.  Plaintiff Asserts He Threw Black Cat Firecrackers Into the Garage
                That Could Have Caused the Fire, But the Police Found No Evidence
                of This. .................................................................................. 12

        3.  The Baltimore County Police Department Determines that the Fire
                Was Intentionally Set. ............................................................ 12

        4.  Upon Realizing that the Baltimore County Police Department
                Considered the Fire to Be Arson, Plaintiff Then Claims He
                Received Several Emails From a "John Doe" That Might Have
                Set the Fire. ........................................................................... 14

    F.  Plaintiff Submits a Second Claim Alleging Guitars Were Stolen After
        the Fire. ................................................................................................. 15

    G.  Plaintiff's Financial Situation at the Time of the Claims Was Poor,
        and It Continued to Deteriorate............................................................. 16

    H.  Bankers Standard's Investigation Reveals Multiple Allegations of Fraud
        and Dishonest Behavior Related to Plaintiff......................................... 18

LEGAL\19520210\1

1.      Investigation by the Delaware Department of Insurance Reveals
        Widespread Fraud by Plaintiff. ............................................................... 18

2.      A Federal Grand Jury Recently Indicted Plaintiff for Making
        Over $5 Million in False Asset Statements to Insurance Regulators........ 20

3.      An Investigation by the Maryland Insurance Administration
        Found Violations of the Maryland Insurance Code. ................................. 21

4.      An Investigation by the DC Department of Insurance Found
        Violations of the DC Insurance Code. ..................................................... 21

5.      Lawsuits Filed By Axiom Insurance Managers Agency, LLC
        Alleged Fraudulent Acts. ......................................................................... 22

I.      Plaintiff Has Failed to Cooperate with Bankers Standard's Investigation. .......... 23

J.      The Maryland Insurance Administration Has Investigated the Claims
        and Found that Bankers Standard's Position is Supported. ................................. 28

K.      Bankers Standard Denied the Claims. ................................................................ 29

III. ARGUMENT AND CITATION OF AUTHORITY ...............................................................29

A.      Standard of Review........................................................................................... 29

B.      Bankers Standard's Denial of Coverage Under the Terms of the
        Policy is Proper Because The Evidence Indicates that Plaintiff May
        Have Set Fire to His Home, and That He Also Has Knowledge Regarding
        The Whereabouts of The Guitars. ....................................................................... 30

C.      Plaintiff Has Not Cooperated With Bankers Standard's Investigation,
        Therefore, Denial of Plaintiff's Claims Is Appropriate Because Plaintiff Has
        Breached the Policy's Terms and Conditions. ..................................................... 41

        1.      Plaintiff's Failure to Produce Financial and Other Documents
                Requested Is a Breach of the Cooperation Provision in the Insurance
                Policy. ....................................................................................................... 42

        2.      Plaintiff's and His Wife's Failure to Submit to the EUO is a Breach
                of the Cooperation Provision in the Insurance Policy. ............................. 46

IV. CONCLUSION....................................................................................................................47

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allison v. State Farm Fire & Cas. Co.*,
   543 So.2d 661 (Miss. 1989)........................................................................42

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)................................................................................29

*Aragona v. St. Paul Fire & Marine Ins. Co.*,
   281 Md. 371, 378 A.2d 1346 (1977) ...................................................31, 33, 40

*Bouchat v. Baltimore Ravens Football Club, Inc.*,
   346 F.3d 514, 522 (4th Cir. 2003) .............................................................29

*Cunningham & Walsh, Inc. v. Atlantic Mut. Ins. Co.*,
   88 Or. App. 251, 744 P.2d 1317 (1987).......................................................32

*Dlugosz v. Exchange Mut. Ins. Co.*,
   176 A.D.2d 1011, 574 N.Y.S.2d 864 (N.Y. App. Div. 1991) ...............................42

*Drewitt v. Pratt*,
   999 F.2d 774, 778-79 (4th Cir. 1993). ......................................................29

*Dyno-Bite, Inc. v. The Travelers Cos.*,
   439 N.Y.S.2d 558, 80 A. D. 2d 471 (N.Y. App. Div. 1981) ...............................41

*Fedele v. Nat'l Liberty Ins. Co.*,
   184 Va. 528, 35 S.E.2d 766 (1945)............................................................31

*Gillespie v. Ruby Tuesday, Inc.*,
   861 F. Supp. 2d 637 (D. Md. 2012) ..........................................................29

*Kisting v. Westchester Fire Ins. Co.*,
   290 F. Supp. 141 (W.D. WI 1968), *aff'd,* 416 F.2d 967 (7th Cir. 1969) ...............42

*Lee v. United Fire & Cas. Co.*,
   607 So.2d 685 (La. Ct. App. 1992)............................................................42

*Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*,
   398 Md. 529 921 A.2d 245 (2007) .........................................................31, 32, 40

*Phillips v. Allstate Indem. Co.*,
   156 Md. App. 729, 848 A.2d 681 (Md. Ct. Spec. App. 2004)....................41, 42, 46

*Pisa v. Underwriters at Lloyd's, London*,
787 F. Supp. 283 (D. R.I. 1992), *aff'd,* 966 F.2d 1440 (1st Cir. 1992) .................................42

*Powell v. United States Fidelity & Guar. Co.*,
855 F. Supp. 858 (E.D. Va. 1994), *aff'd* 88 F.3d 271 (4th Cir. 1996)....................................42

*Ranger Ins. Co. v. Bal Harbour Club, Inc.*,
549 So.2d 1005 (Fla. 1989)....................................................................................................32

*Snyder v. Chester Cnty. Mut. Ins. Co.*,
264 F. Supp. 2d 332 (D. Md. 2003) ......................................................................................42

*St. Paul Fire & Marine Ins. Co. v. Jacobson*,
826 F. Supp. 155 (E.D. Va. 1993) *aff'd,* 48 F.3d 778 (4th Cir. 1995)...................................31

*Stover v. Aetna Cas. & Sur. Co.*,
658 F. Supp. 156 (S.D.W.Va. 1987)............................................................................41, 42, 46

*Templin v. Grange Mut. Cas. Co.*,
81 Ohio App.3d 572, 611 N.E.2d 944 (1992)........................................................................42

*Tran v. State Farm Fire & Cas. Co.*, 136 Wa.2d 214 (1998) ......................................................42

*Travelers Ins. Co. v. Benton*,
278 Md. 542, 365 A.2d 1000 (1976) ......................................................................................31

*United States Fid. & Guar. Co. v. Conaway*,
674 F. Supp. 1270 (D. MS 1987), *aff'd,* 849 F.2d 1469 (5th Cir. 1988) ..............................42

*Wedge Products v. Hartford Equity Sales Co.*,
31 Ohio St.3d 65, 509 N.E.2d 74 (1987) ..............................................................................32

*Wood v. Allstate Ins. Co.*,
21 F. 3d 741 (7th Cir. 1994) ...................................................................................................42

**Statutes**

Fed. R. Civ. P. 56.................................................................................................................................29

Maryland Ins. Code §§ 4-205 and 10-103 ........................................................................................21

**Other Authorities**

*Couch on Insurance* § 39:15 (2d ed. 1985)......................................................................................32

*Freedman's Richard's on Insurance* § 1:13 (6th ed. 1990)............................................................32

iv

**INDEX OF EXHIBITS**
**FOR MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BANKERS**
**STANDARD INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

| EXHIBIT NO. | DESCRIPTION OF EXHIBIT | TAB IN NOTEBOOK |
|---|---|---|
| Exhibit 1 | Policy | Tab 1 |
| Exhibit 2 | Excerpts of Deposition of Jeffrey B. Cohen taken on May 20, 2014 | Tab 2 |
| Exhibit 3 | Article: Milford, Phil, *Claims Journal*, "Nightclub Insurer Founder Fights Delaware Regulator Over Seizure," October 30, 2013 | Tab 3 |
| Exhibit 4 | Maryland Insurance Administration Order Revoking producer licenses | Tab 4 |
| Exhibit 5 | Maryland Insurance Administration Order of Summary Suspension | Tab 5 |
| Exhibit 6 | September 12, 2013, Termination of Employment Contract with Jeffrey B. Cohen by Indemnity Insurance Corporation | Tab 6 |
| Exhibit 7 | Amended Confidential Seizure and Injunction Order, dated September 13, 2013 | Tab 7 |
| Exhibit 8 | Court of Chancery of the State of Delaware Memorandum Opinion, decided January 2, 2014 | Tab 8 |
| Exhibit 9 | Court of Chancery of the State of Delaware, Order Imposing Sanctions and Directing Discovery, dated September 24, 2013 | Tab 9 |
| Exhibit 10 | Court of Chancery of the State of Delaware November 1, 2013, Order Imposing Additional Sanctions | Tab 10 |
| Exhibit 11 | Excerpts of Deposition of Crystal Cohen taken on June 5, 2014 | Tab 11 |
| Exhibit 12 | Residential Dwelling Lease | Tab 12 |
| Exhibit 13 | Declaration of Detective Kurt Wilhelm dated March 28, 2014, with Baltimore County Police Dept. Incident Report attached as Ex. A | Tab 13 |

LEGAL\19520210\1

| Exhibit 14 | Charles B. Hughes & Associates, LLC Rule 26 Report, dated May 23, 2014 | Tab 14 |
| Exhibit 15 | Email correspondence from jeffcohenisathief@gmail.com | Tab 15 |
| Exhibit 16 | Google Records produced on March 27, 2014 | Tab 16 |
| Exhibit 17 | Email correspondence from Google regarding interpretation of data, dated April 25, 2014 | Tab 17 |
| Exhibit 18 | Subpoena to Testify at a Deposition in a Civil Action directed to Plaintiff Jeffrey Cohen | Tab 18 |
| Exhibit 19 | Second Amended Complaint in *Axiom Insurance Managers v. Indemnity Insurance Corporation* | Tab 19 |
| Exhibit 20 | Email from Jeff Cohen regarding location of guitars, dated November 11, 2013 | Tab 20 |
| Exhibit 21 | Email from Alycen Moss to Jeff Cohen dated January 27, 2014 | Tab 21 |
| Exhibit 22 | Email from Jeff Cohen to Alycen Moss dated February 25, 2014 | Tab 22 |
| Exhibit 23 | Email from Alycen Moss to Jeff Cohen dated February 27, 2014 | Tab 23 |
| Exhibit 24 | Expert Report of David Elmore **[FILED UNDER SEAL]** | Tab 24 |
| Exhibit 25 | Excerpts from December 5, 2013, Hearing Transcript on Petitioner's Motion to Show Cause and Respondent's Motion for Disqualification in the Court of Chancery of the State of Delaware | Tab 25 |
| Exhibit 26 | Supreme Court of the State of Delaware's April 9, 2014, Order Affirming the Court of Chancery's Decision | Tab 26 |
| Exhibit 27 | Court of Chancery of the State of Delaware April 11, 2014, Order Granting in Part Motion Seeking Contempt Sanctions | Tab 27 |
| Exhibit 28 | Maryland U.S. Attorney's and FBI's Press Releases, "Businessman Indicted for Making Over $5 Million in False Asset Statements to Government Insurance Regulators," dated  June 25, 2014, | Tab 28 |
| Exhibit 29 | USDC District of Maryland Indictment against Jeffrey B. Cohen, dated June 24, 2014 | Tab 29 |

LEGAL\19520210\1

| | | |
|---|---|---|
| Exhibit 30 | Maryland Insurance Administration Consent Order dated July 27, 2014 | Tab 30 |
| Exhibit 31 | Government of the District of Columbia, Dept. of Insurance Report on Examination re: Indemnity Insurance Corporation of DC, Risk Retention Group, as of December 31, 2008 | Tab 31 |
| Exhibit 32 | *Axiom Insurance* Complaint filed in the United States District Court, Illinois, August 13, 2009 | Tab 32 |
| Exhibit 33 | Email from Corey Everett to Jeff Cohen attaching October 25, 2013, reservation of rights letter | Tab 33 |
| Exhibit 34 | Email from Jeff Cohen to Corey Everett dated October 28, 2013 | Tab 34 |
| Exhibit 35 | Letter from Alycen Moss to Jeff Cohen dated October 30, 2013 | Tab 35 |
| Exhibit 36 | Email from Jeff Cohen to Alycen Moss dated October 30, 2013 | Tab 36 |
| Exhibit 37 | Email from Alycen Moss to Sima Robins, Jeff Cohen's attorney, dated November 3, 2013 | Tab 37 |
| Exhibit 38 | Email from Alycen Moss to Sima Robins, Jeff Cohen's attorney, dated December 2, 2013 | Tab 38 |
| Exhibit 39 | Email from Alycen Moss to Sima Robins, Jeff Cohen's attorney, attaching December 12, 2013, letter to Attorney Alex Brown | Tab 39 |
| Exhibit 40 | Email from Jeff Cohen to Alycen Moss dated March 5, 2014 | Tab 40 |
| Exhibit 41 | Maryland Insurance Administration May 12, 2014 Letter to Jeff Cohen | Tab 41 |
| Exhibit 42 | July 8, 2014, letter from Alycen Moss to Jeff Cohen | Tab 42 |

LEGAL\19520210\1

COMES NOW Defendant Bankers Standard Insurance Company ("Bankers Standard"), by and through its counsel, Cozen O'Connor, and hereby submits this Memorandum of Law in support of its Motion for Summary Judgment, and states as follows:

## I. OVERVIEW

This is an insurance matter involving two claims submitted under Plaintiff Jeffrey B. Cohen's ("Plaintiff" or "Mr. Cohen") homeowner's insurance policy. The first claim relates to a fire at his home located at 1 Cooperfield Court in Phoenix, Maryland, on October 6, 2013 ("Fire Claim"). The second claim relates to the alleged theft of guitars after the fire ("Guitar Claim").[1] Collectively, the Fire Claim and Guitar Claim will be referred to as the "Claims." Due to the suspicious nature of the fire, it was referred to the Baltimore County Police Department's arson department who determined there were several fires intentionally set at the home. Bankers Standard began its own investigation and became aware of numerous allegations of fraudulent and dishonest behavior related to Plaintiff. Throughout Bankers Standard's investigation, Plaintiff has refused to cooperate.

The facts known at this time support the likelihood that Plaintiff started the fire at his home and has knowledge regarding the whereabouts of the guitars. At the very least, Plaintiff has been dishonest with Bankers Standard in the presentation of his Claims. Furthermore, Plaintiff violated the insurance policy provisions by failing to cooperate with Bankers Standard's investigation of the Claims, by deliberately and purposefully interfering with its investigation, and by failing to provide complete and truthful testimony regarding the fire and alleged guitar theft at his deposition.

---

[1] Plaintiff's Complaint only references the Fire Claim; however, both Claims are addressed in Bankers Standard's Motion for Summary Judgment

As a result, Bankers Standard believes it is not contractually liable for Plaintiff's Claims. Bankers Standard's denial of coverage on Plaintiff's Claims is appropriate, and therefore, summary judgment is proper.

## II. <u>STATEMENT OF FACTS</u>

**A.** **<u>The Policy Precludes Coverage for Intentional Loss, Criminal Acts, Misappropriation, Fraud and Concealment.</u>**

Policy No. 268-04-31-17H insured the residential home owned by Jeffrey and Crystal Cohen located at 1 Cooperfield Court in Phoenix, Maryland (the "Cooperfield Home"), for the policy period of November 30, 2012 through November 30, 2013 (the "Policy"). A true, accurate and complete copy of the Policy is attached as Exhibit 1. Plaintiff paid a premium of $8,948 for coverage on 3 locations, including the Cooperfield Home. *See* Policy, Exhibit 1, Policy Summary – Renewal and Home Declarations pages; J. Cohen Dep., p. 48, ll. 8-21 – p. 49, ll. 1-17.

The following Policy provisions are applicable to this claim

**PART I – PROPERTY**

\*\*\*

**LOSSES WE COVER**

We cover risk of direct physical loss to property described in Part **I** of this policy, subject to Losses We Do Not Cover.

**LOSSES WE DO NOT COVER**

We do not cover loss that is caused directly or indirectly, or which ensues from or is the result of any of the following, unless noted otherwise. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

\*\*\*

2

### 3. Intentional Loss

We do not cover any loss arising out of any act committed by or at the direction of an *insured person* with the intent to cause a loss.

### 4. Criminal Acts

We do not cover any loss caused by any criminal or dishonest act by or at the direction of an *insured person*.

### 5. Misappropriation

We do not cover any loss caused by misappropriation, meaning the taking, damaging or destroying of personal property by or at the direction of an *insured person.*

Policy No. 268-04-31-17H, Policy Form HOME ACE-0109, pp. 14-15.

## PROPERTY CONDITIONS

### 1.   Duties After Loss

In case of a loss covered by this policy, we have no duty to provide coverage under this policy unless there has been full compliance with the following duties by an *insured person* or their representative:

\* \* \*

**f.** Cooperate with us in the investigation of a claim.

\* \* \*

**h.** As often as we reasonably require:

**(1)** Show the damaged property;

**(2)** Provide us with records and documents we request and permit us to make copies; and

**(3)** Submit to examination under oath, while not in the presence of another *insured person.*

Policy No. 268-04-31-17H, Policy Form HOME ACE-0109, pp. 17-18.

3

**PART III – GENERAL CONDITIONS**

**1. Concealment Or Fraud**

We do not provide coverage to an *insured person* who, whether before or after a loss or *occurrence* has:

a. Intentionally concealed or misrepresented any material fact or circumstance;

b. Engaged in fraudulent conduct; or

c. Made false statements;

relating to this insurance.

Policy No. 268-04-31-17H, Policy Form HOME ACE-0109, p. 29.

**B.**    **In the Months Prior to the Fire, Plaintiff Was Terminated from his Job, Lost His Insurance License, and Was Ordered to Pay $100,000 into the Registry of the Chancery Court of Delaware.**

In the months leading up to the fire, Plaintiff's life was unraveling. Prior to the fire, Plaintiff was serving as the President of Indemnity Insurance Corporation, Risk Retention Group ("Indemnity"), which provides insurance coverage for establishments such as bars, nightclubs and music venues across the country. A true, accurate and complete copy of the excerpts of Jeffrey B. Cohen's deposition referenced in this Motion is attached as Exhibit 2 and referred to as "J. Cohen Dep.," p. 73, ll. 1-4; p. 264, ll. 11-12. Plaintiff founded Indemnity, and his base salary in 2013 was $▮▮▮▮▮ per year. *Id.* at p. 72, ll. 15-21; p. 73, ll. 5-6; p. 75, ll. 3-6. He made $▮▮▮▮ to $▮▮▮▮▮ per month. *Id.* at p. 320, ll. 12-21 – p. 321, ll. 1-4.

In May 2013, Indemnity was seized by the Delaware Department of Insurance after a lengthy investigation. The Petition for Entry of Confidential Seizure and Injunction Order was heavily redacted, but an article in the *Claims Journal* reported that an Indemnity official (which was later confirmed to be Plaintiff) submitted "a fraudulent bank confirmation," made "misrepresentations in financial statements," took part in "schemes to hide and conceal the true

4

financial condition," and "attempted through bodily force" to keep authorities off its premises. *See* Milford, Phil, *Claims Journal*, "Nightclub Insurer Founder Fights Delaware Regulator Over Seizure," October 30, 2013.   A true, accurate and complete copy of this article is attached as Exhibit 3.   After reviewing the Seizure Petition, the court entered an order … authorizing the Commissioner to take control of the business and assets of Indemnity.   *Id.*   In June 2013, the Commissioner's examiners seized control of Indemnity with the aid of armed sheriff's deputies. *Id.*

On August 16, 2013, Plaintiff's insurance license was suspended, and his license to act as an insurance producer was revoked.   J. Cohen Dep., Ex. 2, p. 121, ll. 13-20.   The Revocation Order states, in part, as follows:

> The conduct of Cohen violates the Insurance Article or another law of the State that relates to insurance in that he has: **misappropriated, converted, or unlawfully withheld money belonging to an insurer; has committed fraudulent or dishonest practices in the insurance business**; or has willfully violated the Insurance Article of the insurance regulatory authority of another state; **has shown a lack of trustworthiness** or competence to act as an insurance producer; **misappropriated or withheld unreasonably funds received or held if the funds represent premiums or return premiums**; conducted business and accepted compensation for acting as an insurance producer in the State without having obtained a license; and has conducted business with an unlicensed business entity.

A true, accurate and complete copy of the Revocation Order is attached as Exhibit 4, Section III, Sanctions, pp. 9-10, ¶ 24 (Emphasis added); *see also* J. Cohen Dep., Ex. 2, pp. 123, l. 10 – p. 125, l. 4.   Likewise, Plaintiff's insurance license was suspended on the same grounds.   A true, accurate and complete copy of the Order of Summary Suspension is attached as Exhibit 5, pp. 2-3, ¶ 3; *see also* J. Cohen Dep., Ex. 2, p. 125, l. 5 – p. 127, l. 20.

On September 12, 2013, Plaintiff was terminated from Indemnity due to "(i) [his] gross mismanagement of this Company's relationship with its regulators, including specifically [his]

undisputed attempts to provide fraudulent bank confirmations to the Company's regulators (and perhaps to its auditors as well) and (ii) [his] recent attempts to drive a wedge between the Company's management and its employees and to damage its relationships with its agents and brokers."  A true, accurate and complete copy of the letter is attached hereto as Exhibit 6; *see also* J. Cohen Dep., Ex. 2, p. 79, ll. 10-21; p. 80, l. 1-15.  Since the date of his termination, Plaintiff has not received any monies from Indemnity.  J. Cohen Dep., Ex. 2, p. 120, ll. 18-21 – p. 121, ll. 1-4.  Therefore, on September 12, 2013, only 3 weeks before the fire, Plaintiff went from an income of $███-███ per month to ███████.  *Id.*; *see also* J. Cohen Dep., Ex. 2, p. 320, ll. 12-21 – p. 321, ll. 1-4.

On September 13, 2013, the Chancery Court of Delaware entered an Amended Seizure Order after hearing evidence that Cohen was attempting to access Indemnity's IT systems and communicating with Indemnity's employees, which he was not permitted to do.  A true, accurate and complete copy of the Amended Confidential Seizure and Injunction Order entered in *In the Matter of the Rehabilitation of Indemnity Insurance Corporation, RRG,* Court of Chancery of the State of Delaware, C.A. No. 8601-VCL, as well as the redacted Petition, is attached as Exhibit 7. The Court found that Plaintiff had access to and was monitoring Indemnity's IT system on an ongoing basis.  A true, accurate and complete copy of the January 2, 2014 Memorandum Opinion entered *In the Matter of the Rehabilitation of Indemnity Insurance Corporation, RRG,,* Court of Chancery of the State of Delaware, C.A. No. 8601-VCL, is attached as Exhibit 8 and discusses Plaintiff's behavior, p. 10; *see also* J. Cohen Dep., Ex. 2, p. 362, ll. 11-21 – p. 363, ll. 1-4.  He instructed an Indemnity employee to not provide the Commissioner with access to Indemnity's systems.  *Id.*  He sent emails to some of Indemnity's business relations claiming he had wrongfully been forced out and that interim management had no experience operating an

6

insurance company.  *Id.*   Additionally, he improperly accessed the email account of one of Indemnity's employees and sent an email to AM Best, a rating agency that covered Indemnity. *Id.*  He also tried to interfere with Indemnity's operations by shutting down its utilities.  *Id.* at p. 12.

Less than an hour after the Amended Seizure Order was docketed, Plaintiff "met with an Indemnity employee who provided him with a surreptitious recording of a meeting that day."  *Id. at* p. 12.  He also sent a text to an Indemnity board member indicating that he had obtained the recording and would bring a lawsuit.  *Id.*  On the same day, September 13, 2013, Plaintiff attempted to "liquidate investments held in deferred compensation accounts for the benefit of certain Indemnity employees.  Indemnity and the Commissioner prevented the accounts held for the benefit [of] Indemnity's then-current employees from being liquidated, but Cohen successfully liquidated the investments in an account held for a former Indemnity employee." *Id.*

On September 24, 2013, Plaintiff was ordered to place $100,000 in escrow due to his acts of interference with the Insurance Commissioner and the discharge of her duties related to the seizure of Indemnity.  A true, accurate and complete copy of the September 24, 2013 Order Imposing Sanctions entered in *In the Matter of the Rehabilitation of Indemnity Insurance Corporation, RRG,* Court of Chancery of the State of Delaware, C.A. No. 8601-VCL, is attached as Exhibit 9; J. Cohen Dep., Ex. 2, p. 360, ll. 4-13.  The Court later required Plaintiff to forfeit the $100,000 due to his additional acts of interference with the Insurance Commissioner's efforts.  A true, accurate and complete copy of the November 1, 2013, Order Imposing Additional Sanctions entered in *In the Matter of the Rehabilitation of Indemnity Insurance*

*Corporation, RRG,* Court of Chancery of the State of Delaware, C.A. No. 8601-VCL, is attached

as Exhibit 10; J. Cohen Dep., Ex. 2, p. 361, ll. 9-15.

**C.**   **Plaintiff's Cooperfield Home Was in Disrepair and the Cohens Had Plans to Renovate, They Moved Out of the Home Shortly Before the Fire, and They Discontinued the Fire and Alarm System 6 Days Prior to the Fire.**

According to Plaintiff and his wife, the Cooperfield Home "had problems with plumbing, [it] had problems with electric, [it] had problems with a bunch of, you know, things. [Mrs. Cohen's] shower didn't run. … The water smelled like sulphur."  A true, accurate and complete copy of the excerpts of Crystal Cohen's deposition referenced in this Motion is attached as Exhibit 11 and referred to as "C. Cohen Dep.," p. 70, ll. 7-12.  There were holes in the drywall "all over the house."  J. Cohen Dep., Ex. 2, p. 289, ll. 7-8; *see also* C. Cohen Dep., Ex. 11, p. 70, ll. 13-17.  There was also a major stink bug infestation at the house.  J. Cohen Dep., Ex. 2, p. 188, ll. 2-21 – p. 189, ll. 1-17.  According to Plaintiff, the house had "a ridiculous amount of stink bugs that was a constant problem." *Id.* at p. 189, ll. 16-17.  Mrs. Cohen agreed there was a problem from the time they moved in the house.  C. Cohen Dep., Ex. 11, p. 84, ll. 17-20.

Plaintiff testified they planned an "extensive" renovation on the home, which included "changing most of the rooms, changing the stairwells."  J. Cohen Dep., Ex. 2, p. 143, ll. 2-8. Plaintiff's and Mrs. Cohen's testimony was inconsistent with regard to the renovation.  Plaintiff stated that the renovation was estimated to cost "a million to a million half;" however, Mrs. Cohen testified that the cost was "$250,000 to $500,000." *Id.* at p. 152, ll. 16-19; C. Cohen Dep., Ex. 11, p. 163, ll. 8-11.  Plaintiff testified that they did not have "an effective date [for the start of the renovation] because [they] were still going through the drawings."  J. Cohen Dep., Ex. 2, p. 148, ll. 17-21.  However, Mrs. Cohen testified they decided not to renovate at all

because of issues with the Homeowners Association ("HOA").[2]  C. Cohen Dep., Ex. 11, p. 83, ll. 6-13.  Plaintiff testified that they were planning to move back in after the renovation.  J. Cohen Dep., Ex. 2, p. 153, ll. 10-12.  Yet, Mrs. Cohen testified that they were not moving back into the house because of the HOA.  C. Cohen Dep., Ex. 11, p. 80, ll. 12-19 – p. 81, ll. 1-8.  Despite their ability to get their stories straight on the renovation, both Plaintiff and Mrs. Cohen testified they never asked the HOA to approve their home renovation plans.  J. Cohen Dep., Ex. 2, p. 151, ll. 11-14; C. Cohen Dep., Ex. 11, p. 83, ll. 14-21; p. 84, ll. 1-9.

At the end of September 2013, Plaintiff and his wife moved from the Cooperfield Home to another house Plaintiff owned on Long Ridge Road in Reisterstown, Maryland ("Long Ridge Home").  J. Cohen Dep., Ex. 2, p. 142, ll. 5-10.  Prior to this move, Indemnity had agreed to pay Plaintiff $9,500 per month to lease his Long Ridge Home to allow Indemnity's Chief Financial Officer ("CFO") to live in the home as part of his compensation package.  A true, accurate and complete copy of the Lease Agreement is attached as Exhibit 12; J. Cohen Dep., Ex. 2, p. 332, ll. 3-17.  It is unclear why, but the CFO and his family moved out of the house in September 2013.  *Id.* at p. 333, ll. 7-8.  This move allowed Plaintiff and his wife to move into the Long Ridge Home for free since the lease was being paid by Indemnity.  *Id.* at p. 333, ll. 8-11.  Plaintiff testified that he expected Indemnity to continue paying the lease payments on the house after he moved in.  *Id.* at p. 333, ll. 12-15.  However, the payments did not continue after Plaintiff was terminated.

---

[2] The Cohens contend they did not know the neighborhood had an HOA when they moved into the Cooperfield Home, and "[t]here was going to be a whole litigation about that."  Cohen Dep., Ex. 2, p. 151, l. 14 - 152, l. 3.  They did not want to live in a neighborhood that had an HOA.  C. Cohen Dep., Ex. 11, p. 74, ll. 5-17.  They planned to sue the title insurer and former owner to ask that they pay for the renovation due to their alleged misrepresentations regarding the HOA.  *Id.* at p. 164, l. 2 – p. 165, l. 5.

9

Due to this move, the "majority" of the items in the Cooperfield Home had been moved out just prior to the fire.  C. Cohen Dep., Ex. 11, p. 81, ll. 12-18.

On September 30, 2013, only six (6) days prior to the fire, the Cohens discontinued the monitored alarm system in the house for intrusion and fire protection, which had separate smoke detectors, door triggers and glass breakage sensors.  *Id.* at p. 61, ll. 4-19.  Plaintiff did not testify consistently with regard to the alarm system in the house.  Initially, he testified "[t]here was an alarm in the house."  J. Cohen Dep., Ex. 2, p. 160, l. 19.   When presented with the letter terminating the alarm system, Plaintiff stated he could not remember whether he knew his wife cancelled the alarm agreement.  *Id.* at p. 192, ll. 9-21.  He then changed his testimony again to say that they "may have had a discussion, I may have said, 'hey, let's just cancel it.'"  *Id.* at p. 194, ll. 15-21.

**D.      Plaintiff Left the Cooperfield Home 20 Minutes Before the Fire Was Seen By a Neighbor, and Due to the Suspicious Circumstances, the Fire Was Referred to the Baltimore County Police Department's Arson Department.**

The fire occurred on Sunday, October 6, 2013. On that day, Plaintiff and his wife had gone to the house to collect some items that had been left by the movers.  J. Cohen Dep., Ex. 2, p. 158, ll. 3-5.  They both went to gather items on the morning of October 6, and Plaintiff went alone in the afternoon.  J. Cohen Dep., Ex. 2, p. 157, ll. 20-21 – p. 158, ll. 3-5; p. 165, ll. 1-4; p. 166, ll. 3-5.

On the second visit to the home, Plaintiff left the Cooperfield Home alone at 3:25 p.m. *Id.* at p. 179, ll. 6-13.   At 3:45 p.m., only 20 minutes after Plaintiff left, a neighbor reported seeing a "large amount of smoke in the area" and immediately called 911.  A true, accurate and complete copy of the Declaration of Det. Kurt Wilhelm, which has the Baltimore County Police Report attached, is attached hereto as Exhibit 13, p. 9.   Fire crews were dispatched to the Cohen's house at 3:46 p.m.  *Id.* at p. 13.   The firefighters observed smoke coming from the

10

attached 3-car garage at the location, and upon entering the garage, they "observed several 'pockets' of unconnected fire." *Id.* The fires were extinguished, and due to the suspicious nature of the fire, it was referred to the Baltimore County Police Department's arson department. *Id.*

**E.**     **Plaintiff Attempted to Implicate the Refrigerator in the Garage and/or Firecrackers as the Cause of the Fire, But the Baltimore County Police Department Concluded the Fire Was Intentionally Set.  He Then Contends a "John Doe" Who Allegedly Sent Him Some Emails Several Weeks Later May Have Caused the Fire.**

     1.     Plaintiff Tries to Implicate the Refrigerator in the Garage as the Cause of the Fire.

At the outset, Plaintiff told both the police and a claim representative from Bankers Standard that the refrigerator in the garage was the cause of the fire.  In his first interview with Det. Kurt Wilhelm ("Det. Wilhelm"), the fire investigator, on the day of the fire, Plaintiff told him "that [he] thought it might have been the fridge because we had some issues with the fridge."  J. Cohen Dep., Ex. 2, p. 184, ll. 14-21 – p. 185, ll. 1-10.  Two days later, on October 8, 2013, Corey Everett ("Mr. Everett"), National General Adjustor for Bankers Standard, called Plaintiff to discuss the Claim.  Plaintiff again advised that the fire may have originated in the refrigerator.  *Id.* at p. 229, ll. 2-10.  Mr. Everett inspected the home the following day, on October 9.  During the inspection, Plaintiff again told Mr. Everett that the fire may have originated in the refrigerator.  *Id. at* p. 228, ll. 18-21 – p. 229, ll. 1.

On October 10, 2013, Bankers Standard retained Charles B. Hughes and Associates, LLC, to investigate the cause and origin of the fire.  Charles B. Hughes ("Mr. Hughes") inspected the property, and conducted a telephone interview with Plaintiff on October 10.  A true, accurate and complete copy of Mr. Hughes' Expert Report is attached as Exhibit 14, p. 4. In that phone interview, Plaintiff informed Mr. Hughes that Det. Wilhelm had concluded the fire originated in the refrigerator.  *Id.* at p. 7.  On October 11, 2013, Mr. Hughes called Det. Wilhelm, who said that he never told Plaintiff the refrigerator was the cause of the fire.  *Id.* at pp. 7-8.  In

fact, it was Det. Wilhelm's opinion that the "refrigerator could be eliminated as the cause and his investigation was proceeding based upon the probability of an intentionally set fire." *Id.* at p. 8.

Despite Plaintiff's insistence that there were problems with the refrigerator that could have caused the fire, Mrs. Cohen testified that the refrigerator in the garage at the Cooperfield Home was not even the refrigerator that had problems. C. Cohen Dep., Ex. 11, p. 167, ll. 8-21 – p. 168, ll. 1-7. Instead, it was a completely different refrigerator that was located at the Long Ridge Home at the time of the fire. *Id.* The only reasonably inference is that Plaintiff informed Det. Wilhelm and Mr. Everett about the refrigerator in the garage having problems in an effort to make it seem like it caused the fire.

> 2. Plaintiff Asserts He Threw Black Cat Firecrackers Into the Garage That Could Have Caused the Fire, But the Police Found No Evidence of This.

Before he left the home on both occasions, Plaintiff said he threw some Black Cat firecrackers into the garage trying to get rid of turkey buzzards, but he did not pick up any debris. J. Cohen Dep., Ex. 2, p. 162, ll. 2-21 – p. 163, ll. 1-15; p. 163, ll. 20-21 – p. 164, ll. 1-5; p. 168, ll. 11-18. Mrs. Cohen also testified that she did not pick up any debris. C. Cohen Dep., Ex. 11, p. 44, ll. 4-10. Despite Plaintiff's insistence that he threw these firecrackers, the police department was "unable to detect any remnants or evidence of fireworks being deployed, either inside the garage or outside on the property." Police Report, Ex. 13, p. 10. The Police Department quickly ruled this out as a possible cause. C. Cohen Dep., Ex. 11, p. 51, ll. 9-16.

> 3. The Baltimore County Police Department Determines that the Fire Was Intentionally Set.

The Baltimore County Police Department's investigation revealed the interior of the garage was nearly empty with limited potential ignition sources. Police Report, Ex. 13, p. 10. The investigation found there were three (3) areas of origin in the garage. *Id.* A propane grill with a small air conditioning unit on top of it was observed in the front of the garage near the

center door. *Id.* Burn patterns on the wall of this location were indicative of the first unconnected fire. *Id.*

The only appliance in use in the garage was a refrigerator. *Id.* The motor and compressor were examined and revealed little fire damage. The cord and electrical outlet were also examined and showed no indications of failure. *Id.* In front of the refrigerator were the remains of several cardboard boxes which had been broken down and several pieces of lumbar. These areas were identified as the second and third areas of origin, and these fires appeared to be separate and unconnected. *Id.*

**The fourth area of origin was the most suspicious: in the master bedroom on the second floor of the home, there was a hole cut into the drywall revealing a PVC pipe with toilet paper wrapped around it. The toilet paper and PVC pipe were both burned.** *Id.* at p. 11 Also inside the wall, approximately 2 feet from the pipe, were the burned remains of the roll of toilet paper. When asked about this, Mr. Cohen stated that "he was embarrassed to say that the damage was caused by a 'mishap' of a candle" and did not elaborate further. *Id.* at p. 16, 11; J. Cohen Dep., Ex. 2, p. 290, ll. 4-10.

The Baltimore County Police Department concluded the fires were intentionally set and stated as follows:

> [T]he fire originated at three distinct areas in the garage and another in the wall of the master bathroom, located on the second floor of the home. **All the fires were separate and not spread by conduction, convection, radiation or drop down and were determined to be incendiary in nature and were caused by the application of an open flame device to available combustible materials. The presence of an ignitable liquid may have also been a factor in these fires**.

Police Report, Ex. 13, p. 11, Emphasis added.

13

4.      Upon Realizing that the Baltimore County Police Department Considered the Fire to Be Arson, Plaintiff Then Claims He Received Several Emails From a "John Doe" That Might Have Set the Fire.

Once Plaintiff realized the Baltimore County Police Department considered the fire to be intentionally set, he then claimed that he received several emails from a "John Doe" and says this could be the person who may have set the fire.   On October 16, 2013, Plaintiff went to the Baltimore County Police Headquarters for an interview.   Police Report, Ex. 13, p. 15.   In that interview, Plaintiff was advised the fire was intentionally set, and he was asked if he had any idea of who could be responsible for setting the fire.   *Id.*   Plaintiff responded that he did not know of anyone.   *Id.*

Approximately one week later, Plaintiff called Det. Wilhelm and said he had received suspicious emails from a "John Doe" email account with the email address jeffcohenisathief@gmail.com.   *See* Det. Wilhelm's Declaration, Ex. 13, ¶ 3; a true, accurate and correct copy of the email exchange is attached as Exhibit 15.   The email exchange was dated October 22, 2013.   Records produced by Google show the email address was created on October 21, 2013, and the only activity on the account was on October 22, 2013.   A true, accurate and complete copy of the information produced by Google is attached as Exhibit 16.

Although Google provided the IP address, it did not have information showing the identity of the person associated with the IP address.   A true, accurate and correct copy of the correspondence from Google on this issue is attached as Exhibit 17.   Bankers Standard, therefore, requested Plaintiff's electronic devices to determine whether he could have set up this email account.   A true, accurate and complete copy of the Subpoena is attached as Exhibit 18. He refused to produce his electronic devices, even after Order by the Court.   A Motion for Sanctions is currently pending before the Court on this issue.   *See* Docket No. 35.

14

Plaintiff has a history of sending sham emails, and this email exchange is extremely suspicious.  As is stated above, he improperly accessed the email account of one of Indemnity's employees and sent an email to AM Best, a rating agency that covered Indemnity.  *See* 1/2/14 Memorandum Opinion, Ex. 8, p. 10.   Additionally, in the case styled *Axiom Insurance v. Indemnity and Jeffrey Cohen,* Axiom Insurance alleged that Mr. Cohen sent anonymous emails using a pseudonym to third parties.  A true, accurate and complete copy of the Second Amended Complaint in *Axiom Insurance v. Indemnity and Jeffrey Cohen*, United States District for the Northern District of Illinois, Eastern District, No. 11 CV 2051, is attached as Exhibit 19, ¶ 53.

## F.      **Plaintiff Submits a Second Claim Alleging Guitars Were Stolen After the Fire.**

At some point after the fire, Plaintiff contended that guitars were missing from the home. J. Cohen Dep., Ex. 2, p. 298, ll. 1-3, 13-15.  However, it does not appear these guitars are, in fact, missing.  On November 11, 2013, Plaintiff advised Mr. Everett in writing that the guitars were "removed by the independent adjustor."  A true, accurate and complete copy of the email is attached hereto as Exhibit 20; J. Cohen Dep., Ex. 2, p. 301, ll. 1-15.

Bankers Standard contacted the independent adjustor, Mike Schwartzer ("Mr. Schwartzer"), in an attempt to investigate the Guitar Claim and the contents of the email. However, he refused the request for an interview.  Based on information known at this time, it is questionable whether this theft occurred.  Because Plaintiff has not proven there is "a direct physical loss" of the guitars, Bankers Standard has determined it is not contractually liable for the Claim.  It advised Plaintiff of this in its letter of January 27, 2014.  A true, accurate and complete copy of the letter is attached as Exhibit 21.

On February 25, 2014, Plaintiff responded to Bankers Standard's letter arguing that the denial of coverage was improper.  A true, accurate and complete copy of the letter is attached as Exhibit 22; J. Cohen Dep., Ex. 2, p. 305, ll. 11-21.  Banker's Standard's counsel responded to the

letter asking that Plaintiff assist in arranging an interview with Mr. Schwartzer and sit for an Examination Under Oath ("EUO").  A true, accurate and complete copy of the letter is attached as Exhibit 23; J. Cohen Dep., Ex. 2, p. 307, ll. 1-4.  Plaintiff never arranged the interview with Mr. Schwartzer, and he never sat for the EUO.  J. Cohen Dep., Ex. 2, p. 307, ll. 11-28; p. 308, ll. 11-13.

**G.      Plaintiff's Financial Situation at the Time of the Claims Was Poor, and It Continued to Deteriorate.**

Prior to his termination from Indemnity, Plaintiff was making approximately ██████ ████ per month.  J. Cohen Dep., Ex. 2, p. 320, ll. 12-21 – p. 321, ll. 1-4.  Since his termination with Indemnity in September 2013, Plaintiff's only income has been ████.  *Id.* at p. 111, ll. 1-5; p. 121, ll. 9-12.  Additionally, Plaintiff testified that he received a "residual check from a life insurance policy" in the amount of ███.  *Id.* at p. 70, ll. 8-14.  **This is the only income or other financial compensation Plaintiff has received since September 2013**.  *Id.* at p. 111, ll. 1-5; p. 121, ll. 9-12.  Plaintiff himself agrees that his income was significantly less after he was terminated from Indemnity.  *Id.* at p. 321, ll. 12-15.  Despite this admission, Plaintiff testified that he made "[n]o real material changes in spending."  *Id.* at p. 321, ll. 16-20.

During this lawsuit, Bankers Standard requested the financial information from Plaintiff's banking and financial entities directly.[3]  The documentation shows that ████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[3] During the claims investigation, Plaintiff would not cooperate with Bankers Standard's request to provide the names, addresses and phone numbers of his financial entities, which is discussed in more detail below.  Therefore, Bankers Standard could not request the information until the lawsuit.

███████████████████████████████████████████

███████████ A true, accurate and complete copy of the Expert Report of David Elmore is

being filed under seal as Exhibit 24,  p. 6.

Additionally, Plaintiff has a "negative 2 million equity" in all your houses.  They're all

under water."  A true, accurate and complete copy of a transcript from a December 5, 2013

hearing held in the Delaware Chancery Court regarding, in part, Plaintiff's financial situation is

attached as Exhibit 24, p. 89, ll. 14-19; J. Cohen Dep., Ex. 2, p. 327, ll. 10-13.  █████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

On top of these financial issues, Plaintiff has been ordered to pay monetary sanctions due

to his interference with the Amended Seizure Order.  In September 2013, he was ordered to pay

$100,000 into the Registry of the Chancery Court, and this was later forfeited due to additional

interference with the Insurance Commissioner's efforts.  *See* 9/24/13 Order, Ex. 9, 11/1/13

Order, Ex. 10; J. Cohen Dep., Ex. 2, p. 360, ll. 14-17; p. 361, ll. 9-18.  In November 2013,

Plaintiff was ordered to place an additional $500,000 in escrow.  *See* 11/1/13 Order, Ex. 10; J.

Cohen Dep., Ex. 2, p. 361, ll. 9-18.  Plaintiff has still not put the $500,000 in escrow and testified

that he did not "have $500,000 to deposit into the Court."  *See* 12/5/13 Hearing Transcript, Ex.

25, p. 88, ll. 7-8 J. Cohen Dep. Ex. 2, p. 328, ll. 14-21 – p. 329, ll. 1-4.

Without question, Plaintiff's financial condition worsened significantly in the months

prior to the Claims, and it is continuing to worsen.

17

**H.      Bankers Standard's Investigation Reveals Multiple Allegations of Fraud and Dishonest Behavior Related to Plaintiff.**

During the course of its investigation, Bankers Standard became aware of multiple allegations of fraud, dishonest behavior, and questionable insurance practices related to Plaintiff and companies he owned.  Plaintiff and/or his companies, which the Delaware Supreme Court described as "a dog's breakfast of shell entities," have been investigated by the Delaware Department of Insurance, DC Department of Insurance, Maryland Insurance Administration, and possibly other entities.   A true, accurate and correct copy of the Supreme Court's Opinion entered in *In the Matter of the Rehabilitation of Indemnity Insurance Corporation, RRG,* Supreme Court of the State of Delaware, C.A. No. 8601-VCL, is attached as Exhibit 26, p. 21. Most recently, a federal grand jury indicted Plaintiff for making over $5 Million in false asset statements to insurance regulators. The following briefly sets forth Plaintiff's dishonest and/or fraudulent behavior uncovered in these investigations:

1.      Investigation by the Delaware Department of Insurance Reveals Widespread Fraud by Plaintiff.

The Seizure Petition alleged there were fraudulent misrepresentations made regarding Indemnity's assets and solvency.   The Delaware Chancery Court found that "[t]he Seizure Petition was supported by documentary evidence and averred that Indemnity was in a precarious financial position due to multiple acts of fraud by Mr. Cohen." *See* 1/2/14 Memorandum Opinion, Ex. 8, p. 2. The Order also sets forth an elaborate scheme related to falsifying documents related to accounts held at Susquehanna Bank**, the same bank that supposedly held Plaintiff's mortgage statement that he submitted to Bankers Standard**. *Id.* at pp. 3-6.  The Court determined that Indemnity's solvency issues were due to material misrepresentations made by Plaintiff. *Id.* at pp. 6-7.

18

Furthermore, as is set forth above, Plaintiff tried to interfere with the Delaware Insurance Commissioner and Indemnity after he was terminated.  He was punished with a sanction of $100,000, which was ultimately forfeited due to his additional interference with the Commissioner when Plaintiff attempted to liquidate investments held in deferred compensation accounts for the benefit of certain Indemnity employees.  *See* 9/24/13 Order, Ex. 9, p. 2; 1/2/14 Memorandum Opinion, Ex. 8, p. 12.  He also tried to shut down Indemnity's utilities and contacted Verizon to shut off Indemnity's phone service.  *See* 1/2/14 Memorandum Opinion, Ex. 8, pp. 12-13.  Plaintiff also sent impermissible emails to some of Indemnity's business relations claiming he had wrongfully been forced out and that interim management had no experience operating an insurance company.  *Id.* at p. 14.

The Court later required Plaintiff to forfeit the $100,000 due to his additional acts of interference with the Insurance Commissioner's efforts.  *See* 11/1/13 Order Imposing Additional Sanctions, Ex. 10; J. Cohen Dep., Ex. 2, p. 361, ll. 9-15.  The Court also ordered that Plaintiff post a $500,000 security bond due to additional violations of the Seizure Order.  *Id.*  The Supreme Court of Delaware has affirmed this decision.  *See* Supreme Court Opinion, Ex. 26; J. Cohen Dep., Ex. 2, 367, ll. 4-7.

Plaintiff was sanctioned a third time in January 2014 when he disregarded the Court's Order requiring him to return vehicles owned by Indemnity.  *See* 1/2/14 Memorandum Opinion, Ex. 8; J. Cohen Dep., Ex. 2, p. 362, ll. 11-15; p. 363, ll. 2-4.  Not only did Plaintiff return the vehicles after the date ordered by the Court, but he "willfully returned the Aston Martin and Mustang in a manner calculated to interfere with the operations of Indemnity and the Commissioner."  *Id.* at p. 20.  Specifically, the Court stated:

> The Court directed Cohen to use an agent to return the cars
> because the court was concerned about Cohen's interactions with

> Indemnity.  Rather than using an agent, Cohen returned the cars himself.  He parked the Aston Martin so as to block the main entrance to Indemnity's parking lot, and he parked the Mustang so as to block Indemnity's main entrance.  He failed to return the keys until November 5, even though he had the means to return them on November 4.  As a result, the keys were not returned until after Indemnity was forced to have the vehicles towed.

*Id.* at pp. 20-21.

Plaintiff was sanctioned a fourth time in April 2014 for filing a replevin action against the Commissioner and communicating personally with Indemnity employees (in one instance asking the employee, "How can you live with yourself.  You are disgusting."), which again violated Amended Seizure Order.  A true, accurate and complete copy of the Order Granting in Part Motion Seeking Contempt Sanctions, entered in *In the Matter of the Rehabilitation of Indemnity Insurance Corporation, RRG,* Court of Chancery of the State of Delaware, C.A. No. 8601-VCL, is attached as Exhibit 27.  Because the prior monetary sanctions had not been effective, the Court stated it would issue a warrant for his arrest and impose as a sanction a period of incarceration if Plaintiff violated the Amended Seizure Order again.  *Id.* at p. 9.

2.  <u>A Federal Grand Jury Recently Indicted Plaintiff for Making Over $5 Million in False Asset Statements to Insurance Regulators.</u>

Just 2 weeks ago, a federal grand jury indicted Plaintiff for making over $5 Million in false asset statements to insurance regulators.  A true, accurate a complete copy of the Press Releases from the United States Attorney's Office, District of Maryland, and the Federal Bureau of Investigation is attached hereto as Exhibit 28.  According to the Press Releases and the Indictment, in June 2012, regulators from the Delaware Insurance Commissioner examined Indemnity and became concerned about its financial status, for many of the reasons discussed above.  *Id.*; *see also* a true, accurate and complete copy of the Indictment in *USA v. Cohen*, United States District Court, District of Maryland, Case No. 1:14-cr-00310-WDQ, which is

attached hereto as Exhibit 29.  Thereafter, in November 2012 and January 2013, Plaintiff allegedly caused Indemnity to file an unaudited financial statement with, and sent a letter to, the Commissioner, respectively, which falsely claimed that Indemnity had $5.1 million in cash on deposit, in order to influence the actions of the Commissioner.  *Id.*  In April 2013, Plaintiff caused a fax to be submitted to the Commissioner that falsely claimed a bank had verified that Indemnity had $5.1 million in cash on deposit at the bank.  *Id.*

Plaintiff was arrested on June 25, 2014, and his detainment hearing was held on June 27. *Id.*  Plaintiff did not request bail, and as of the date of the filing of this Motion, it is believed Plaintiff is still in jail.

3.    An Investigation by the Maryland Insurance Administration Found Violations of the Maryland Insurance Code.

In 2003/2004, another company owned by Plaintiff, Insurance Designers of Md, Inc., was investigated by the Maryland Insurance Administration ("MIA").  It was determined that this company violated Maryland Ins. Code §§ 4-205 and 10-103.  A true, accurate and complete copy of the Consent Order is attached as Exhibit 30, J. Cohen Dep., Ex. 2, p. 355, ll. 9-15.  The Consent Order is not clear with regard to the specific actions and violations, but it appears the company may have been writing insurance without a license.  *Id.*

4.    An Investigation by the DC Department of Insurance Found Violations of the DC Insurance Code.

From June 17, 2004 through December 31, 2008, the Government of the District of Columbia, Department of Insurance, Securities and Banking ("DC Department of Insurance"), performed a full-scope financial investigation of Indemnity.  A true, accurate and complete copy of the DC Department of Insurance Report is attached as Exhibit 31; J. Cohen Dep., Ex. 2, p. 357, ll. 4-11.  The DC Department of Insurance made multiple findings in Report, some of which are the following:

21

- Indemnity wrote policies in excess of limits approved by the DC Department of Insurance.  Ex. 31 at pp. 20-21, 35; J. Cohen Dep., p. 358, ll. 8-15.

- Indemnity failed to maintain reinsurance coverage on certain policies.  Ex. 31 at pp. 21-22, 36; J. Cohen Dep., p. 358, ll. 16-19.

- Indemnity obtained a letter of credit in the amount of $47 million, which expired on December 31, 2009, but the Company did not record the letter of credit on its quarterly financial statement until the DC Department of Insurance required it to do so.  Ex. 31 at p. 39; J. Cohen Dep., p. 358, ll. 20-21 – p. 359, ll. 1-9

- Indemnity collected membership fees from its insureds, which should have been remitted to the International Association of Entertainment Businesses, Inc., but Indemnity retained the membership fees and recorded them as part of premiums collected from insureds.  Ex. 31 at p. 39; J. Cohen Dep., p. 359, ll. 13-20.

5. <u>Lawsuits Filed By Axiom Insurance Managers Agency, LLC Alleged Fraudulent Acts.</u>

Bankers Standard also become aware of an August 2009 lawsuit filed by Axiom Insurance Managers Agency, LLC ("Axiom Insurance") against Indemnity alleging it had misrepresented its financial health to the AM Best credit rating agency, the DC Department of Insurance, and the National Association of Insurance Commissioners to gain an unfair advantage in the marketplace.  At true, accurate and correct copy of the lawsuit is attached as Exhibit 32.

Another lawsuit filed by Axiom in March 2011 alleged that Indemnity misrepresented its financial structure to AM Best, the DC Dept. of Insurance, Securities & Banking, and to NAIC.

*See* Exhibit 19.  In particular, the lawsuit alleges that in September 2009, Indemnity fabricated a $47 million letter of credit in order to create a reported surplus of $50 million.  *Id.* at ¶¶ 22-33. The lawsuit also alleges that Indemnity falsified financial statements by stating that Plaintiff injected $10 million in cash into the company, which was untrue.  *Id.* at ¶¶ 34-38.  As is stated above, this lawsuit also contends that Plaintiff sent anonymous emails using a pseudonym to third parties.  *Id.* at ¶ 53.

## I.  Plaintiff Has Failed to Cooperate with Bankers Standard's Investigation.

Once Bankers Standard was informed that the fire was intentionally set, Plaintiff had been dishonest about the refrigerator being the cause of the fire, the Cohens had moved out of their home only weeks before the fire, and they had terminated the Cooperfield Home's alarm service 6 days before the fire, it became concerned that Plaintiff may have some involvement with the fire.  On October 25, 2013, Mr. Everett sent a reservation of rights letter to the Cohens explaining "the fire [had] been referred to the investigating authority's arson department and we have been told the fire was deliberately set and is not of accidental origin."  A true, accurate and complete copy of the letter is attached as Exhibit 33.  Bankers Standard further explained that it was conducting an investigation into the circumstances of the Claim and asked the Cohens to provide a copy of documents that would aid in its investigation, such as documents related to Plaintiff's home, finances, phone records, alarm records, and Plaintiff's whereabouts on the day of the fire.  *Id.*  In part, Bankers Standard requested the following:

- Records related to the burglary or fire alarms at the location;

- Documents or other materials establishing Plaintiff's location on October 6, 2013;

- Cell phone and home telephone statements showing outgoing and incoming calls for the months of September and October, 2013;

23

- Documents related to Plaintiff's financial condition as of October, 2013, including statements and loan payment records from his banks, credit unions, and/or investment or brokerage companies; copies of statements from credit cards and/or invoices from credit cards, and statements related to car loans or car lease payments.

- Copies of Plaintiff's payroll statements for September 2013 and October 2013;

- Data from Quicken or QuickBooks, if used; and

- Federal and state tax returns for the calendar years 2011 and 2012.

*Id.*

The following day, Plaintiff sent an email to Mr. Everett and Tony Guerriero, Vice President at Bankers Standard, stating that he would not "permit two peon adjusters such as yourselves to intimidate me … ."  A true, accurate and complete copy of the email is attached as Exhibit 34; J. Cohen Dep., Ex. 2, p. 246, ll. 1-21.  He also sent what was represented to be a copy of a mortgage statement and one (1) page of an internet print-out of a bank account.  *Id.*  The mortgage statement did not indicate which property it related to – it only showed it was from Susquehanna Bank and was mailed to 950 Ridgebrook Rd, Suite 1500, Sparks, Maryland, which is not the home at issue in these Claims.  *Id.*

Due to the nature of Plaintiff's email, Bankers Standard retained Cozen O'Connor as counsel.  On October 30, Alycen A. Moss ("Ms. Moss"), counsel for Bankers Standard, wrote Plaintiff again requesting the documents to assist in its investigation, and also asking to take the EUOs of Mr. and Mrs. Cohen.  A true, accurate and complete copy of the letter is attached as Exhibit 35.  Ms. Moss also asked Plaintiff to sign an Authorization to Obtain his Credit Report.  *Id.*

24

Plaintiff responded with an email stating: "Before your 'crack-shot' legal team from Cozen wastes too much money, you may want to get in touch with the Baltimore County Detective working this fire. … As far as the information you are requesting, my counsel will be in touch."  A true, accurate and complete copy of his email is attached as Exhibit 36; J. Cohen Dep., Ex. 2, p. 255, ll. 13-21.

Around this time, Bankers Standard became aware of some of the above-referenced allegations of fraud and deception, and it became concerned that any documents provided by Plaintiff could be fraudulent.  Accordingly, it concluded it should request any documents directly from the financial institution or other entity.  On November 13, 2013, Bankers Standard requested that the Cohens provide the name, address and phone number of the following:

- the entity that held any mortgages or loans on the location;

- the installer of the alarm service at the location and the alarm service company, including central station alarm service, in 2013;

- any entities providing cell phone, home, business, or other telephone and/or data services to the Cohens for the months of September and October 2013;

- all of the Cohen's banks, credit unions, and/or investment or brokerage companies for the time period of September 2012-October 2013;

- all entities with whom the Cohens had a credit card for the time period of September 2012-October 2013;

- all entities with whom the Cohens had a car loan or car lease for the time period of September 2012-October 2013; and

- all employers for the Cohens for the time period of September 2012 and October 2013.

A true, accurate and complete copy of the email is attached as Exhibit 37.  Bankers Standard also requested that Mr. and Mrs. Cohen sign an Authorization and advised that Bankers Standard would request the information directly from the entity.  *Id.*  It also asked that the Cohens complete an IRS Form 4506 so that it could obtain their tax returns directly from the IRS.  *Id.* Finally, it again asked that Mr. and Mrs. Cohen sign an Authorization to Obtain Credit Report. *Id.*

Instead of completing the forms, Plaintiff produced his tax returns for 2011 and 2012, as well as partial copies of credit card statements.  Due to the allegations of fraudulent behavior and falsifying documents related to Plaintiff, Bankers Standard did not feel it could rely on the documents produced by Plaintiff.  Therefore, on December 2, 2013, Bankers Standard reiterated that it would like to obtain the documents directly from the financial institution or other entity. A true, accurate and complete copy of this email is attached as Exhibit 38.  For the third time, Bankers Standard asked that the Cohens sign an Authorization to Obtain Credit Report.  It also made a second request asking that they sign the Authorizations for Bankers Standard to independently obtain the other relevant documents.  *Id.*

On December 12, 2013, for the third time, Bankers Standard asked for the names, addresses and phone numbers of the above-referenced entities and asked that the Cohens complete the authorizations.  Bankers Standard also asked again that Mr. and Mrs. Cohen sit for an EUO.  A true, accurate and complete copy of the letter is attached as Exhibit 39.  Bankers Standard received no response to this letter.  Instead, Plaintiff filed the above-captioned lawsuit.

On January 27, 2014, Bankers Standard wrote Plaintiff a letter advising that, due to his refusal to cooperate, Bankers Standard was unable to complete its investigation.  A true, accurate

and complete copy of the letter attached as Exhibit 21.  Bankers Standard advised that it would continue to investigate during the pendency of the lawsuit.  *Id.*

In fact, Bankers Standard has continued its investigation during this lawsuit, much to Plaintiff's dismay.  It has subpoenaed documents from third parties, and when Bankers Standard served the Subpoenas, Plaintiff emailed Ms. Moss stating "you are pathetic."  A true, accurate and complete copy of the email is attached hereto as Exhibit 40; J. Cohen Dep., Ex. 2, p. 273, ll. 14-21 – p. 274, ll. 1-5.  When asked why he wrote the email, Plaintiff responded, "Because I think you're pathetic."  J. Cohen Dep., Ex. 2, p. 274, ll. 6-7.

On May 12, 2014, Plaintiff was served with a Subpoena Duces Tecum which required him to bring the following electronic devices to his deposition scheduled for May 20, 2014:

> You are commanded to produce at the time, date and place set forth in the attached Subpoena the following devices, electronically stored information, or objects used during the time period of September 1, 2013, through the present, for inspection, copying, testing, sampling, examination, and/or review:
>
> 1. All mobile devices, including cell phones, tablets, pre-paid phones, and/or other devices;
>
> 2. All external devices, including external hard drives, USB flash drives, and any other attachable, external media; and
>
> 3. All computer processing units (desktop computers), laptops, or other computers used during this time period.

*See* Subpoena Duces Tecum, Ex. 18.  Plaintiff did not file a Motion for Protective Order, Motion to Quash, or any other Motion seeking to modify or limit the Subpoena.  Plaintiff appeared at the deposition on May 20, 2014; however, he did not bring any electronic devices – even though he had his iPhone in his car.  After a telephone conference with the Court, Judge Motz ordered Plaintiff to go to his vehicle and retrieve his mobile phone, as well as provide Bankers Standard with any other electronic devices, pursuant to the Subpoena.  J. Cohen Dep., Ex. 2, p. 33, ll. 11-12; p. 34, ll. 3-5; p. 34, ll. 9-15 and 18-21; p. 35, ll. 2-5; p. 36, l. 15; p. 37, ll. 1-2; p. 38, ll. 5-7.

27

Judge Motz warned Plaintiff that he would be found in contempt if he did not comply with his Order. *Id.* at p. 34, ll. 9-15 and 18-21. Plaintiff refused to do so.

Towards the end of the deposition Plaintiff finally agreed to provide his phone to be imaged, but there was not enough time to complete the imaging process. *See* Declaration of Richard T. Gould, Docket No. 35-1, ¶ 5. Although Plaintiff initially agreed to the process, when his deposition ended at 5:35 pm, he abruptly unplugged his phone from the imaging device causing it to lose all imaged data. Gould Decl., ¶ 6. Plaintiff has since refused to produce his electronic devices, even though the Court ordered him to do so. A Motion for Contempt is currently pending. *See* Docket No. 35.

Instead of cooperating with Bankers Standard's investigation, Plaintiff filed the present lawsuit and a complaint with the Maryland Insurance Administration against Bankers Standard (which was subsequently determined to have no validity). This was a deliberate attempt to obstruct Bankers Standard from investigating the Claims.

**J.**    **The Maryland Insurance Administration Has Investigated the Claims and Found that Bankers Standard's Position is Supported.**

On January 14, 2014, Plaintiff filed a complaint with the Maryland Insurance Administration ("MIA"). The MIA performed a full investigation of Plaintiff's allegations, and on May 12, 2014, it found that Bankers Standard's "position is supported by the results of its claims investigation and specific language from the policy. As such, Bankers Standard's actions have not been [shown] to be arbitrary and [capricious], to be lacking in good faith, or to otherwise be in violation of the Insurance Article." A true, accurate and complete copy of this letter is attached as Exhibit 41.

**K.**     **Bankers Standard Denied the Claims.**

On July 8, 2014, Bankers Standard denied the Claims based on the facts and evidence set forth above and applicable law.  A true, accurate and complete copy of the declination letter is attached as Exhibit 42.

## III. ARGUMENT AND CITATION OF AUTHORITY

**A.**     **Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Supreme Court has clarified that this does not mean that any factual dispute will defeat a motion for summary judgment.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A genuine issue of material fact arises only if a reasonable jury could find for the non-moving party on that fact.  *Id*. at 248.

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Gillespie v. Ruby Tuesday, Inc.*, 861 F. Supp. 2d 637, 641 (D. Md. 2012) quoting *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).  Although the Court must view the facts in the light most favorable to the party opposing the motion, "the court also must abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Gillespie*, 861 F. Supp. 2d at 641, *quoting Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993).

LEGAL\19520210\1

Here, the evidence shows that Plaintiff had the motive and opportunity to set his house on fire.  Additionally, the evidence shows that Plaintiff knew the whereabouts of the guitars.  In opposing Bankers Standard's Motion for Summary Judgment, Plaintiff cannot simply rest on his own rendition of the facts.  Rather, he must come forth with affirmative evidence to establish a genuine issue of material fact, which he cannot do.  Accordingly, under applicable summary judgment standards, Bankers Standard is entitled to summary judgment.

**B.**     **<u>Bankers Standard's Denial of Coverage Under the Terms of the Policy is Proper Because The Evidence Indicates that Plaintiff May Have Set Fire to His Home, and That He Also Has Knowledge Regarding The Whereabouts of The Guitars.</u>**

The Policy precludes coverage for intentional loss, criminal acts, misappropriation (meaning the taking, damaging or destroying of personal property by or at the direction of an insured person), fraud and concealment.  Specifically, the Policy states:

> **LOSSES WE DO NOT COVER**
>
> We do not cover loss that is caused directly or indirectly, or which ensues from or is the result of any of the following, unless noted otherwise.  Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> \*\*\*
>
> **3.  Intentional Loss**
>
> > We do not cover any loss arising out of any act committed by or at the direction of an *insured person* with the intent to cause a loss.
>
> **4.  Criminal Acts**
>
> > We do not cover any loss caused by any criminal or dishonest act by or at the direction of an *insured person*.
>
> **5.  Misappropriation**
>
> > We do not cover any loss caused by misappropriation, meaning the taking, damaging or destroying of personal property by or at the direction of an *insured person.*

30

Policy No. 268-04-31-17H, Policy Form HOME ACE-0109, pp. 14-15.

Furthermore, the "General Conditions" section of the Policy precludes coverage for concealment or fraud stating:

### PART III – GENERAL CONDITIONS

#### 1. Concealment Or Fraud

We do not provide coverage to an *insured person* who, whether before or after a loss or *occurrence* has:

   a. Intentionally concealed or misrepresented any material fact or circumstance;

   b. Engaged in fraudulent conduct; or

   c. Made false statements;

relating to this insurance.

Policy No. 268-04-31-17H, Policy Form HOME ACE-0109, p. 29.

Construction of insurance contracts in Maryland is governed by a few well-established principles. *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 540 921 A.2d 245 (2007). "An insurance contract, like any other contract, is measured by its terms unless a statute, a regulation or public policy is violated thereby." *Id.* Maryland law holds that an insurance policy is <u>not</u> strongly construed against the insurer. *Aragona v. St. Paul Fire & Marine Ins. Co.*, 281 Md. 371, 375, 378 A.2d 1346, 1348 (1977), *citing Travelers Ins. Co. v. Benton*, 278 Md. 542, 365 A.2d 1000 (1976).

Without question, public policy in the Fourth Circuit, and across the country, precludes an individual from insuring against fraud, his own intentional wrongdoing, or criminal misconduct. *St. Paul Fire & Marine Ins. Co. v. Jacobson*, 826 F. Supp. 155, 162 (E.D. Va. 1993) *aff'd*, 48 F.3d 778 (4th Cir. 1995); s*ee also Fedele v. Nat'l Liberty Ins. Co.*, 184 Va. 528, 35 S.E.2d 766 (1945) (elementary principles of public policy deny recovery to insured who

fraudulently set fire to property covered by policy); *Cunningham & Walsh, Inc. v. Atlantic Mut. Ins. Co.*, 88 Or. App. 251, 744 P.2d 1317, 1319–20 (1987) ("to provide coverage for fraud would violate public policy"); *Wedge Products v. Hartford Equity Sales Co.,* 31 Ohio St.3d 65, 509 N.E.2d 74, 76 (1987) ("public policy is contrary to insurance against intentional torts"); *Ranger Ins. Co. v. Bal Harbour Club, Inc.*, 549 So.2d 1005, 1007 (Fla. 1989) ("it is axiomatic in the insurance industry that one should not be able to insure against one's own intentional misconduct"); *Couch on Insurance* § 39:15 (2d ed. 1985) ("[a]ny insurance which purports to protect the insured against any loss which he may purposely or willfully cause,  or  which  may arise from his immoral, fraudulent or felonious conduct, is void against public policy"); *Freedman's Richard's on Insurance* § 1:13 (6th ed. 1990) ("[i]t is universally recognized that an implied exception to coverage under any form of insurance is an intentional or expected injury, damage, or loss").

Courts have explained that, if coverage was allowed in circumstances where an insured has engaged in intentional misconduct or criminal behavior, this would encourage insureds to engage in illegal acts and then "rely on the availability of insurance to shield them from the civil consequences of their misconduct." *Jacobson*, 826 F. Supp. at 163.  Barring coverage under those circumstances prevents insureds from essentially "enjoying the fruits of their wrongful acts." *Id*.

In *Moscarillo v. Prof'l Risk Mgmt. Servs., Inc.*, 398 Md. 529, 921 A.2d 245 (2007), the Court of Appeals of Maryland interpreted a policy provision that excluded coverage for any claims "arising out of or in connection with any dishonest, fraudulent, criminal, maliciously or deliberately wrongful acts or omission, or violations of the law committed by the Insured." *Moscarillo*, 398 Md. at 550.  In reading the policy as a whole, the Court held that the "ordinary

meaning of the words used makes it clear that the parties did not intend to cover any claim …

that is based on an <u>alleged</u> fraudulent act or omission." *Id.* The Court stated that dishonest,

fraudulent, criminal, malicious, or deliberately wrongful conduct of the insured "is precisely the

sort of conduct the policy sought to exclude from coverage," and it specifically noted that such

claims of intentional conduct should be excluded, whether finally adjudicated or not. *Id.*

Furthermore, the Court held that the "unambiguous language of the policy excludes coverage for

fraud, "whether proven or unproven." *Id.*

Therefore, evidence gathered by an insurance company of the insured's fraud, criminal

activity, or intentional conduct contributing to the loss is sufficient to deny coverage, and the

activity does not have to be proven or adjudicated for the denial to stand. *Id.*; *see also Aragona*,

281 Md. at 379-80 (in determining that the dishonest and criminal acts of the insured were

excluded from coverage, the Court of Appeals of Maryland held that "the insurance carrier

contracted to underwrite a specific coverage and should not subsequently be expected to assume

liability for a risk which it expressly excluded.")

Although it has not definitively been determined who set the fire, the following facts

indicate Mr. Cohen is most likely the one responsible:

1.    As is set forth above, Mr. Cohen has a history of adjudicated fraudulent, dishonest
      and deceitful behavior.

2.    Most recently, a federal grand jury indicted Plaintiff "for making more than
      $5 Million in false asset statements to government insurance regulators." *See*
      United States Attorney's Office, District of Maryland, and the FBI's Press
      Releases, Ex. 28, and the Indictment, Ex. 29.

LEGAL\19520210\1

3.      In the months leading up to the fire, Plaintiff's life was unraveling around him. The occurrences and actions during that time show Mr. Cohen's problems, frame-of-mind and behavior in the weeks and months prior to the fire.

   a.      The Company that he founded was seized by the Delaware Department of Insurance after a lengthy investigation finding that Plaintiff had submitted "a fraudulent bank confirmation," made "misrepresentations in financial statements," took part in "schemes to hide and conceal the true financial condition," and "attempted through bodily force" to keep authorities off its premises.  *See* Milford, Phil, *Claims Journal*, "Nightclub Insurer Founder Fights Delaware Regulator Over Seizure," October 30, 2013.  Ex. 3.

   b.      In June 2013, the Commissioner's examiners seized control of Indemnity with the aid of armed sheriff's deputies.  *Id.*

   c.      On August 16, 2013, Plaintiff's insurance license was suspended, and his license to act as an insurance producer was revoked on the grounds that Plaintiff had "misappropriated, converted, or unlawfully withheld money belonging to an insurer; [had] committed fraudulent or dishonest practices in the insurance business; or [had] willfully violated the Insurance Article of the insurance regulatory authority of another state; … [had] shown a lack of trustworthiness or competence to act as an insurance producer; misappropriated or withheld unreasonably funds received or held if the funds represent premiums or return premiums …"  Revocation Order, pp. 9-10, Ex. 4; Suspension Order, Ex. 5, pp. 2-3; J. Cohen Dep., Ex. 2, p. 121, ll. 13-20; pp. 123-125.

d.      On September 12, 2013, Plaintiff was terminated from Indemnity due, in

part, to his "gross mismanagement of this Company's relationship with its

regulators, including specifically your undisputed attempts to provide

fraudulent bank confirmations to the Company's regulators (and perhaps

to its auditors as well) …"  *See* September 12, 2013 letter, Exhibit 6; J.

Cohen Dep., Ex. 2, p. 79, ll. 10-21; p. 80, l. 1-15.

e.      Since the date of his termination, Plaintiff has not received any monies

from Indemnity.  J. Cohen Dep., Ex. 2, p. 120, ll. 18-21 – p. 121, ll. 1-4.

Therefore, on September 12, 2013, only 3 weeks before the fire, Plaintiff

went from an income of $⬛⬛⬛⬛ per month to ⬛⬛⬛⬛.

*Id.*; *see also* J. Cohen Dep., p. 320, ll. 12-21 – p. 321, ll. 1-4.

f.      On September 13, 2013, the Chancery Court of Delaware entered an

Amended Seizure Order after hearing evidence that Plaintiff was

attempting to access Indemnity's IT systems and communicating with

Indemnity's employees, which he was not permitted to do.   Amended

Seizure and Injunction Order, Ex. 7; 1/2/14 Memorandum Opinion, Ex. 8,

p. 10.  He had also sent emails to some of Indemnity's business relations

claiming he had wrongfully been forced out and that interim management

had no experience operating an insurance company.  *Id.*  Less than an hour

after the Amended Seizure Order was docketed, Plaintiff "met with an

Indemnity employee who provided him with a surreptitious recording of a

meeting held that day. *Id.* at p. 12.  Cohen also sent a text to an Indemnity

board member indicating that he had obtained the recording and would bring a lawsuit. *Id.*

4.  At the end of September 2013, Plaintiff and his wife moved out of the Cooperfield Home. J. Cohen Dep., Ex. 2, p. 142, ll. 5-10; p. 156, ll. 9-14; p. 332, l. 21 – p. 333, ll. 1-3.

5.  The "majority" of the items in the Cooperfield Home were moved out prior to the fire. C. Cohen Dep., Ex. 11, p. 81, ll. 12-15.

6.  The Cohens planned an "extensive" renovation on the home, which included "changing most of the rooms, changing the stairwells." J. Cohen Dep., Ex. 2, p. 143, ll. 2-8. Plaintiff and Mrs. Cohen's testimony was inconsistent with regard to whether they were planning to move back in after the renovation was complete. *Id.* at p. 152, ll. 16-19; p. 153, ll. 10-12; C. Cohen Dep., Ex. 11, p. 83, ll. 6-13.

7.  Plaintiff was having major financial issues before and after the fire.

    a.  Prior to his termination from Indemnity, Plaintiff was making approximately $█████████ per month. J. Cohen Dep., Ex. 2, p. 320, ll. 12-25 – p. 321, ll. 1-4. Since his termination with Indemnity in September 2013, Plaintiff's only income has been $████, plus a $██ residual check from a life insurance policy. *Id.* at p. 111, ll. 1-5; p. 121, ll. 9-12; p. 70, ll. 8-14. Plaintiff, however, has made "[n]o real material changes in spending." *Id.* at p. 321, ll. 16-20.

    b.  On September 13, 2013, Mr. Cohen attempted to "liquidate investments held in deferred compensation accounts for the benefit of certain Indemnity employees. Indemnity and the Commissioner prevented the

accounts held for the benefit [of] Indemnity's then-current employees from being liquidated, but Cohen successfully liquidated the investments in an account held for a former Indemnity employee." *See* 1/2/14 Order, Exhibit 8.

c.   On September 24, 2013, Plaintiff was ordered to place $100,000 in escrow due to his acts of interference with the Insurance Commissioner and the discharge of her duties related to the seizure of Indemnity. *See* 9/24/13 Order, Exhibit 9; J. Cohen Dep., Ex. 2, p. 360, ll. 4-13. The Court later ordered that this money be turned over to Indemnity due to Mr. Cohen's violations of the Seizure Order. *See* 11/1/13 Order Imposing Additional Sanctions, Ex. 10, p. 17.

d.   After the $100,000 bond was forfeited, the Chancery Court ordered that Mr. Cohen post a $500,000 security bond due to additional violations of the Seizure Order. *Id.* In a hearing held on December 5, 2013, Mr. Cohen testified that "lack[ed] the assets to post this amount." *See* Hearing Transcript, Ex. 25. He moved to stay the obligation to post the $500,000 bond. *See* 1/2/14 Memorandum Opinion, Ex. 8, p. 23.

e.   A review of Plaintiff's bank statements shows ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

LEGAL\19520210\1



Elmore Report, Ex. 22, p. 6.

    f.    Plaintiff has a "negative 2 million equity" in all [his] houses.  They're all under water."   12/5/13 Hearing Transcript, Ex. 25, p. 89, ll. 14-19; J. Cohen Dep., Ex. 2, p. 327, ll. 10-13.

    i

    g.    Plaintiff's move from the Cooperfield Home to the Long Ridge Home allowed Plaintiff and his wife to move into the Long Ridge Home rent-free since the lease was being paid by Indemnity.  *Id.* p. 333, ll. 8-11.

8.    The Cooperfield Home was in a state of disrepair before the fire.  The house had plumbing and electrical problems.  C. Cohen Dep., Ex. 11, p. 70, ll. 7-12.  The shower in Mrs. Cohen's bathroom did not work.  *Id.*  The water smelled like sulphur.  *Id.* at p. 70, ll. 7-12.  There were holes in the drywall "all over the home."  J. Cohen Dep., Ex. 2, p. 289, ll. 7-8; C. Cohen Dep., Ex. 11, p. 70, ll. 13-17.  There was also a major stink bug infestation at the house.  J. Cohen Dep., Ex. 2, p. 188, ll. 2-21 – p. 189, ll. 17; C. Cohen Dep., Ex. 11, p. 84, ll. 17-20.

9.      On September 30, 2013, only six (6) days prior to the fire, the Cohens discontinued the monitored alarm system in the house for intrusion and fire protection (which had separate smoke detectors, door triggers and glass breakage sensors).  C. Cohen Dep., Ex. 11, p. 61, ll. 4-19.

10.     The Baltimore County Police Department's investigation revealed the fires were set intentionally.  The fire originated at three distinct areas in the garage and another in the wall of the master bathroom, located on the second floor of the home.  They were caused by the application of an open flame device to available combustible materials.  The presence of an ignitable liquid may have also been a factor in these fires.  Police Report, Ex. 13, p. 11.

11.     The only appliance in use in the garage was a refrigerator.  *Id.* at p. 10.  After the fire, Plaintiff repeatedly pointed to the refrigerator as the cause of the fire; however, the motor and compressor were examined and revealed little fire damage.  *Id.*  The cord and electrical outlet were also examined and showed no indications of failure.  *Id.*

12.     The area of origin in the master bedroom on the second floor of the home was suspicious as there was a hole cut into the drywall revealing a PVC pipe with toilet paper wrapped around it.  *Id.* at p. 11.  The toilet paper and PVC pipe were both burned.  *Id.*  Also inside the wall, approximately 2 feet from the pipe, were the burned remains of the roll of toilet paper.  *Id.*  Mr. Cohen's explanation that this was "caused by a 'mishap' of a candle" does not make any sense.  *Id.* at pp. 11 and 16; J. Cohen Dep., Ex. 2, p. 290, ll. 4-10.

13. Plaintiff left his home only 20 minutes before the fire was seen by a neighbor.  J. Cohen Dep., Ex. 2, p. 179, ll. 6-13

14. Mr. Cohen told the investigators that he lit several "black cat" firecrackers before he left the home.  However, the fire department was "unable to detect any remnants or evidence of fireworks being deployed, either inside the garage or outside on the property."  Police Report, Ex. 13, p. 10.

15. Upon being told that the Police Department thought the fire was intentionally set, Plaintiff then produced a copy of an email exchange from a "John Doe" with the email address jeffcohenisathief@gmail.com.   He said this could be from the person that may have started the fire.  Exs. 13 and 15.

16. Plaintiff sent an email saying he knew the location of the guitars.  *See* Ex. 20.

Based on the facts known at this time and the available evidence, it appears Plaintiff may have started the fire at his home and been dishonest about the guitar loss.  At the very least, there appears to be some intention by Plaintiff to cause these losses and/or dishonesty regarding same. Dishonest, fraudulent, and criminal conduct of the insured is precisely the sort of conduct the Policy seeks to exclude from coverage, and such claims of intentional conduct should be excluded, whether finally adjudicated or not.  *See Moscarillo*, 398 Md. at 550.

As in the *Moscarillo* case,  the unambiguous language of the Policy excludes coverage for intentional loss, criminal acts, misappropriation, fraud and concealment, "whether proven or unproven."  *Id.*  The facts and evidence clearly indicate that Plaintiff's fraud, criminal activity, and/or intentional conduct contributed to the loss, and this is sufficient to deny coverage.  The activity does not have to be proven or adjudicated for the denial to stand.  *Id.*; *see also Aragona*, 281 Md. at 379-380.

Based on the undisputed facts and case law precedent, it is clear that Bankers Standard's denial of coverage for the Claims is proper and summary judgment is appropriate.

**C.     Plaintiff Has Not Cooperated With Bankers Standard's Investigation, Therefore, Denial of Plaintiff's Claims Is Appropriate Because Plaintiff Has Breached the Policy's Terms and Conditions.**

Under the terms of the Policy, the insured must "[c]ooperate with [Bankers Standard] in the investigation of a claim," "provide us with records and documents we request and permit us to make copies;" and "[s]ubmit to examination under oath, while not in the presence of another insured person."  If there has not been "full compliance with [these] duties," then Bankers Standard has "no duty to provide coverage under this policy."  Policy No. 268-04-31-17H, Policy Form HOME ACE-0109, Ex. 1, pp. 17-18.

Cooperation clauses in insurance policy provisions are commonly found and deemed valid under Maryland law.  *See Phillips v. Allstate Indem. Co*., 156 Md. App. 729, 747, 848 A.2d 681, 691 (Md. Ct. Spec. App. 2004).  "The reason for including a cooperation clause in the policy and for conducting examinations pursuant to it is obvious enough. The company is entitled to obtain, promptly and while the information is still fresh, 'all knowledge, and all information as to other sources and means of knowledge, in regard to the facts, material to their rights to enable them to decide upon their obligations, and to protect them against false claims. And every interrogatory that [is] relevant and pertinent in such an examination [is] material, in the sense that a true answer to it [is] of the substance of the obligation of the assured.'"  *Stover v. Aetna Cas. & Sur. Co.*, 658 F. Supp. 156, 159 (S.D.W.Va. 1987), *citing  Dyno-Bite, Inc. v. The Travelers Cos.,* 439 N.Y.S.2d 558, 80 A. D. 2d 471 (N.Y. App. Div. 1981) (internal citations omitted).

"Courts have generally viewed compliance with insurance policy provisions as a condition precedent to recovery. ... Hence, the failure of an insured to cooperate with the insurer

LEGAL\19520210\1

has been held to be a material breach of the contract and a defense to a suit on the policy… this is so whether the failure to cooperate is manifested by a refusal to submit to an examination under oath, or a refusal to produce documents.  *Stover,* 658 F. Supp. at 159-60 (internal citations omitted); *see also Phillips*, 156 Md. App. at 743.

       1.    <u>Plaintiff's Failure to Produce Financial and Other Documents Requested Is a Breach of the Cooperation Provision in the Insurance Policy.</u>

The Policy requires the insured to "provide us with records and documents we request and permit us to make copies." Policy No. 268-04-31-17H, Policy Form HOME ACE-0109, Ex. 1, pp. 17-18.   Maryland law recognizes the validity of such provisions and requests for information in similar circumstances.  *See Snyder v. Chester Cnty. Mut. Ins. Co.*, 264 F. Supp. 2d 332 (D. Md. 2003) (holding insurer's request for financial information was reasonable).   The Fourth Circuit has also held that financial documents are relevant and reasonable when the insurer suspects fraud.  *See Powell v. United States Fidelity & Guar.  Co.,* 855 F. Supp. 858, 860 (E.D. Va. 1994), *aff'd*  88 F.3d 271 (4th Cir. 1996).   Moreover, under similar factual scenarios, other federal and state courts have also concluded that the insured's financial condition is the proper subject of post-loss examination by insurance companies.  *See Wood v. Allstate Ins. Co.*, 21 F. 3d 741 (7th Cir. 1994); *Pisa v. Underwriters at Lloyd's, London,* 787 F. Supp. 283 (D. R.I. 1992), *aff'd,* 966 F.2d 1440 (1st Cir. 1992); *Templin v. Grange Mut. Cas. Co.,* 81 Ohio App.3d 572, 611 N.E.2d 944 (1992); *United States Fid. & Guar. Co. v. Conaway,* 674 F. Supp. 1270 (D. MS  1987), *aff'd,* 849 F.2d 1469 (5th Cir. 1988); *Stover v. Aetna Cas. & Sur. Co.*, 658 F. Supp. 156 (S.D. W.Va. 1987); *Kisting v. Westchester Fire Ins. Co.,* 290 F. Supp. 141 (W.D. WI 1968), *aff'd,* 416 F.2d 967 (7th Cir. 1969); *Lee v. United Fire & Cas. Co.,* 607 So.2d 685 (La. Ct. App. 1992); *Dlugosz v. Exchange Mut. Ins. Co.,* 176 A.D.2d 1011, 574 N.Y.S.2d 864 (N.Y. App. Div. 1991); *Allison v. State Farm Fire & Cas. Co.,* 543 So.2d 661 (Miss. 1989); *Tran v. State Farm*

*Fire & Cas. Co.*, 136 Wa.2d  214 (1998).  "To request financial documents, an insurer need only believe in good faith that there is a possibility of fraud."  *Snyder*, 264 F. Supp. at 338.

Without question, there is a probability of fraud here.  The fire at Plaintiff's home has been determined to be intentionally set.  Plaintiff has a history of dishonest and fraudulent behavior.  He moved out of his house weeks before the fire and terminated his contract with the home's security company just days before the fire occurred.  He was fired from his job and was having financial difficulties.  Therefore, Bankers Standard has a good faith belief there is a possibility of fraud.

Bankers Standard initially requested the following documents to help it understand Plaintiff's whereabouts on the day of the fire, when and why the contract with the home's alarm company would have been terminated, and Plaintiff's financial situation:

- Records related to the burglary or fire alarms at the location;

- Documents or other materials establishing Plaintiff's location on October 6, 2013;

- Cell phone and home telephone statements showing outgoing and incoming calls for the months of September and October, 2013;

- Documents related to Plaintiff's financial condition as of October, 2013, including statements and loan payment records from his banks, credit unions, and/or investment or brokerage companies; copies of statements from credit cards and/or invoices from credit cards, and statements related to car loans or car lease payments.

- Copies of Plaintiff's payroll statements for September 2013 and October 2013;

- Data from Quicken or QuickBooks, if used; and

- Federal and state tax returns for the calendar years 2011 and 2012.

43

With the exception of the screen shot for a bank account and mortgage statement that did not appear to relate to the Cooperfield Home, Plaintiff did not produce any of these documents. Instead, he responded to Mr. Everett's letter by calling him a "peon."  *See* Ex. 33.

After Bankers Standard became aware of the fraudulent and dishonest behavior related to Plaintiff, it became concerned that any documents provided by Mr. Cohen could be fraudulent. Accordingly, it concluded it should request any documents directly from the financial institution or other entity.  On November 13, 2013, Bankers Standard requested that the Cohens provide the name, address and phone number of the following:

- the entity that held any mortgages or loans on the location;

- the installer of the alarm service at the location and the alarm service company, including central station alarm service, in 2013;

- any entities providing cell phone, home, business, or other telephone and/or data services to the Cohens for the months of September and October 2013;

- all of the Cohen's banks, credit unions, and/or investment or brokerage companies for the time period of September 2012-October 2013;

- all entities with whom the Cohens had a credit card for the time period of September 2012-October 2013;

- all entities with whom the Cohens had a car loan or car lease for the time period of September 2012-October 2013; and

- all employers for the Cohens for the time period of September 2012 and October 2013.

*See* Exhibit 35.  Bankers Standard also requested that Mr. and Mrs. Cohen sign an Authorization and advised that Bankers Standard would request the information directly from the entity.  *Id.*

44

Bankers Standard also asked that the Cohens complete an IRS Form 4506 so that it could obtain their tax returns directly from the IRS. *Id.* Finally, Bankers Standard again asked that Mr. and Mrs. Cohen sign an Authorization to Obtain Credit Report. *Id.* Bankers Standard asked for this information on 3 other occasions, but it was never provided. *See* Exhibits 37, 38 and 39.

Plaintiff never produced any documents regarding the burglary or fire alarms at the location, phone statements, bank statements, statements from investment accounts, complete copies of credit card statements, or statements related to car loans or car lease payments. He did not produce copies of his last and cumulative payroll statements for September 2013 and October 2013. Although he testified that he used QuickBooks, he refused to produce this data. J. Cohen Dep., Ex. 2, p. 242, ll., 19-21 - 243, ll. 1-18. He also did not provide the names, addresses, or phone numbers for these entities. Furthermore, Plaintiff has not produced his electronic devices, even though the Court ordered him to do so.

Instead of providing this information or authorizing Bankers Standard to obtain the information, Plaintiff attempted to give the appearance of producing the financial documentation by providing a computer screen shot of account balances, a mortgage statement that (on its face) did not appear to relate to the Cooperfield Home, tax returns for 2011 and 2012, and incomplete credit card statements for a couple of hand-picked months. By producing this limited financial information, Plaintiff was trying to manipulate the situation to make it seem like his financial circumstances were much better than they actually were.

 The limited financial documents produced by Plaintiff did not give an accurate picture of Plaintiff's financial situation. Presumably, this is exactly why he refused to produce all of them, and why he refused to authorize Bankers Standard to obtain the documents directly from the entities. When Bankers Standard obtained the financial documentation through third-party

requests, it was clear Plaintiff's financial condition was very poor and getting worse.  *See* Elmore Report, Ex. 24.

It is undisputed that Plaintiff did not provide the information requested, and he has breached the cooperation provision of the Policy.  Because there has not been "full compliance" with Plaintiff's duties under the Policy, Bankers Standard has "no duty to provide coverage." Policy No. 268-04-31-17H, Policy Form HOME ACE-0109, Ex. 1, pp. 17-18.

> 2.    <u>Plaintiff's and His Wife's Failure to Submit to the EUO is a Breach of the Cooperation Provision in the Insurance Policy</u>.

The Policy requires the insured to "[s]ubmit to examination under oath, while not in the presence of another insured person."  Policy No. 268-04-31-17H, Policy Form HOME ACE-0109, Ex. 1, pp. 17-18.   Plaintiff and his wife failed to submit to an EUO during Bankers Standard's Claim investigation.  Bankers Standard asked that they submit to an EUO on three occasions on the Fire Claim, but they refused to provide dates.   Bankers Standard also asked that Plaintiff sit for an EUO on the Guitar Claim.  Plaintiff never did so.  J. Cohen Dep., Ex. 2, p. 308, ll. 11-13.

Plaintiff's and his wife's failure to sit for an EUO is a breach of the insurance contract, and in effect, a failure to cooperate.  *See Phillips*, 156 Md. App. at 743 (holding there was a breach of the insurance contract when the insured failed cooperate in answering relevant, material questions during an EUO); *see also Stover*, 658 F. Supp. at 160 ("An outright refusal to submit to an examination is the easy case. Courts have also found a failure of cooperation, however, when the insured refused to answer material questions during the examination.  …This is so because an insurer has a right to examine as to <u>*any*</u> matter material to its liability.")

Here, Plaintiff and his wife's refusal to submit to an EUO is a breach of the cooperation clause under the Policy.  Accordingly, they have breached the insurance contract such that denial of Plaintiff's Claims is appropriate.

## IV. <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant Bankers Standard respectfully requests that this Court enter an Order granting its summary judgment.

Respectfully submitted this 9th day of July, 2014.

/s/ Alycen A. Moss

Alycen A. Moss, Admitted *Pro Hac Vice*
Georgia Bar No. 002598
COZEN O'CONNOR
303 Peachtree Street, N.E., Ste. 2200
Atlanta, GA  30308
Telephone:   (404) 572-2000
Facsimile:    (404) 572-2199
Email: amoss@cozen.com

and

Thomas J. Whiteford
Federal Bar No. 22965
WHITEFORD TAYLOR & PRESTON LLP
Seven St. Paul Street
Baltimore, MD  21202-1636
Telephone:   (410) 347-8705
Facsimile:    (410) 234-2361
Email:  twhiteford@wtplaw.com

*Attorneys for Bankers Standard Insurance Company*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

JEFFREY B. COHEN,                                    *

               Plaintiff,          *

vs.

                            *          Civil Action No.  1:14-CV-00313-JFM

BANKERS STANDARD INSURANCE
COMPANY d/b/a ACE PRIVATE RISK          *
SERVICES,
                            *

               Defendant.          *

*     *     *     *     *     *     *     *     *     *     *     *     *

**CERTIFICATE OF SERVICE**

      This is to certify that on July 9, 2014, I served a true and complete copy of the foregoing

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BANKERS STANDARD**

**INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT** via Electronic Mail

and U.S. Mail on the following:

                      Jeffrey B. Cohen, *pro se*
                      2419 Long Ridge Road
                      Reisterstown, MD  21136
                      jcohen@risk-works.com

                      /s/ Alycen A. Moss
                      Alycen A. Moss, Admitted *Pro Hac Vice*