# EXHIBIT 2

**REDACTED VERSION**

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND
2
           CIVIL ACTION NO. 1:14-CV-00313-JFM
3

4   JEFFREY B. COHEN,            :

5        Plaintiff,              :         **REDACTED**

6   vs.                         :

7   BANKERS STANDARD INSURANCE  :

8   COMPANY d/b/a ACE PRIVATE    :

9   RISK SERVICES,               :

10       Defendant,              :

11

12          * * * * * * * * * * * * * * * * * * * *

13        Deposition of JEFFREY B. COHEN

14             Baltimore, Maryland

15           Tuesday, May 20, 2014

16

17

18  Reported by:  Donna Evans, Court Reporter

19  Job No.  137299

20

21



1    A.    Yes.

2    Q.    So you know the general rules of the

3  deposition.  If you don't hear a question, let

4  me know and I can repeat it for you.  If I ask

5  you a question that you don't understand or

6  doesn't make sense to you, ask me to clarify

7  it, I'm happy to do that.

8         If you do answer a question, I'm

9  going to assume that you understood it.  Is

10 that fair?

11   A.    Yes.

12   Q.    If you need a break at any time, let

13 me know, we can take any sort of breaks.  Try

14 to not nod you head or say "uh-huh", "uh-uh" to

15 answers or to questions.  Court Report's taking

16 all this down and she needs to make sure she

17 takes it down accurately.

18        Can you state your full name for the

19 record, please?

20   A.    Jeffrey Brian Cohen.

21   Q.    And what is your date of birth?



1          Q.     And who owns that?

2          A.     IDG Companies.

3          Q.     And what do you use that for,

4    personal use?

5          A.     Personal and business.

6          Q.     And when did you use it?

7          A.     Various times.

8          Q.     Okay.

9                 Let's -- I want to take a break for

10   a second.   I'll be right back.

11                (Whereupon, off the record at

12                9:45 a.m.)

13                (Whereupon, back on the record at

14                9:55 a.m.)

15   BY MS. MOSS:

16         Q.     So I've called Judge Motz's chambers

17   and got him on the phone because I wanted him

18   to have an opportunity to hear what's going on

19   with regard to this subpoena and the fact that

20   you have not brought the mobile devices that I

21   requested in Exhibit A to my subpoena.   Judge



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 5 of 98

JEFFREY B. COHEN                                          May 20, 2014
COHEN vs. BANKERS STANDARD                                          32

1   Motz...

2              JUDGE MOTZ: (inaudible)

3              THE COURT REPORTER: I can't

4   understand what he is saying.

5              THE DEPONENT: I can't hear, I

6   can't understand him.

7              THE COURT REPORTER: I can't

8   understand him.

9              MS. MOSS: So Mr. Cohen is here

10  right now.  He has not brought any of the

11  devices to the deposition but he does have an

12  iPhone in the car which he refuses to bring and

13  I was hoping you could give us a little

14  guidance as to whether or not he needs to bring

15  that upstairs to me so that it can be imaged.

16             JUDGE MOTZ:  Well, he doesn't have

17  to but then he'd be held in contempt.  I mean,

18  I ordered that they bring, actually why don't I

19  -- I thought it was Mrs. Cohen...

20             MS. MOSS: Right, yesterday you

21  talked about Mrs. Cohen, Mr. Cohen is here



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 6 of 98

JEFFREY B. COHEN                                    May 20, 2014
COHEN vs. BANKERS STANDARD                                  33

1  right now.  So your order yesterday had to do

2  with Mrs. Cohen.   But...

3              JUDGE MOTZ:  There was never any

4  protective order and you filed the same Notice

5  of Deposition?

6              MS. MOSS: Yes, it's the same

7  notice of deposition, there was never a

8  protective order filed.  Mr. Cohen has just

9  appeared for the deposition this morning

10  without any mobile devies.

11              JUDGE MOTZ: Well, he can produce

12  the devices and they should be imaged ....

13              THE COURT REPORTER:  I am not

14  making out what he is saying.

15              MS. MOSS:  It's okay.

16              JUDGE MOTZ: (Speaking to Ms. Moss

17  and Mr. Cohen via phone)

18              THE DEPONENT:  Your Honor, I don't

19  own the devices, they're not mine to give.  In

20  addition, we would need a forensic expert on

21  both sides to make sure the chain of custody if



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 7 of 98

JEFFREY B. COHEN                                    May 20, 2014
COHEN vs. BANKERS STANDARD                               34

1   proper on the copying.

2                   MS. MOSS: Sir, he...

3                   JUDGE MOTZ:   They are to be

4   produced right now.   Go to your car and get

5   them.

6                   THE DEPONENT:   I don't think that

7   I can because of the privilege aspect.   I'm a

8   pro se litigant.

9                   JUDGE MOTZ: Well, you're caught

10  between a rock and hard place when you've been

11  directed by me to get them and produce them.

12  If you have concerns, then you have concerns

13  but you're under a Court order to do it and you

14  better be right because otherwise you'll be

15  held in contempt.

16                  THE DEPONENT:   I'm sorry, I

17  couldn't hear the last part.

18                  JUDGE MOTZ:   I said you better

19  produce, you'd better be right about your

20  concerns, if not you're going to be held in

21  contempt.



1              THE DEPONENT: All right.

2              JUDGE MOTZ:  I mean, this is

3    ridiculous.  I mean, this -- there was never

4    any objection filed.  But you've got to go

5    downstairs and get them and produce them.

6                   (Inaudible to court reporter.

7              Judge talking to Counsel and

8              Deponent via phone)

9              THE DEPONENT: It's a corporate

10   phone that's not owned by myself.

11             MS. MOSS: That it's -- he's not

12   sure who even owns, it's either The Agency, LLC

13   or IDG.  Which are both single member LLC's

14   that are ultimately owned by Mr. Cohen.  So the

15   game about he doesn't own it is not, is just

16   that.  It's a game.

17             THE DEPONENT: Well, IDG Companies

18   is under an order under the Delaware Court that

19   I'm not to exert control over any assets of

20   IDG.

21             MS. MOSS: He doesn't even know if



1   IDG owns the phone.  Bottom line is, he's got a

2   personal phone in his car that he uses on a

3   daily basis and he refuses to bring it in.

4         THE DEPONENT: Your Honor, we would

5   need a forensic expert to do the copying.

6         MS. MOSS:  You can get your own.

7         THE DEPONENT:  You would need one

8   as well.

9         MS. MOSS:  I have on here.

10         THE DEPONENT: Okay, well, then we

11   can agree to have our experts meet to copy all

12   electronic media.

13         MS. MOSS:  No, I have an expert

14   here today, I Subpoenaed the documents...

15         JUDGE MOTZ: Produce the phone now.

16         THE DEPONENT:  The Subpoena wasn't

17   even proper, Your Honor.

18         MS. MOSS:  The Subpoena is proper.

19         JUDGE MOTZ: I didn't have any

20   objection to it.  I'm sitting here I have

21   other, other work, I'm getting a call, there



1   was no objection filed no anything.  Your phone

2   is to be produced and imaged.  (Inaudible to

3   Court Reporter.  Judge speaking to Counsel and

4   Deponent)

5              THE DEPONENT: Your Honor, I'm

6   afraid I'm going to violate a Delaware order if

7   I do that.  I think this needs more briefing.

8              JUDGE MOTZ: Well, I'm sorry, I'm

9   sorry.  You didn't file an objection.  The --

10  in theory did you use the phone?

11             THE DEPONENT: Pardon me?

12             JUDGE MOTZ:  Did you use the phone

13  personally for personal calls?

14             THE DEPONENT: Yes.

15             JUDGE MOTZ: Okay.

16             THE DEPONENT:  And I use it for,

17  I'm a pro se litigant so there's many privilege

18  items within the phone so I think this matter

19  requires more briefing.

20             JUDGE MOTZ:  This issue should

21  have been raised before -- you're a lawyer,



1   aren't you?

2              THE DEPONENT:  I can't hear you.

3              JUDGE MOTZ:  Are you a lawyer?

4              THE DEPONENT:  No, sir.

5              JUDGE MOTZ:  Okay, well, in any

6   event produce it, it'll be imaged and that's an

7   order.  Thank you all very much.

8              MS. MOSS:  Thank you, sir.

9              THE COURT REPORTER:  And was that

10  M-O-T..

11             MS. MOSS: M-O-T-Z.

12             THE DEPONENT:  If he wants to have

13  a show cause why I'm in contempt, I'm going to

14  have to run the risk because I can't produce it

15  without clearance from the Delaware Court.

16  BY MS. MOSS:

17       Q.    Well, why don't we call the Delaware

18  Court.

19       A.    Go for it.

20       Q.    Who do you need clearance from?  The

21  counsel for the DOI?



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 12 of 98

JEFFREY B. COHEN                                    May 20, 2014
COHEN vs. BANKERS STANDARD                               48

1      Q.    It looks like this policy goes to

2   2419 Long Ridge Road, right?

3      A.    What do you mean "goes to"?

4      Q.    Is that where the policy is sent?

5      A.    Yes.

6      Q.    And that's your home address?

7      A.    Yes.

8      Q.    If you look at the coverage that's

9   listed there, you've got home, auto, umbrella

10  and valuables, correct?

11     A.    Correct.

12     Q.    The premium for your home owner's

13  coverage is $8,948.00, correct?

14     A.    Yes, the homeowner's portion of this

15  policy is $8,948.00.

16     Q.    Okay, and the policy period is

17  November 30, 2012 through November 30, 2013,

18  right?

19     A.    Correct.

20     Q.    All right, if you turn two pages

21  over to The Home Declarations page, you'll see



1  that there are three different covered

2  properties under this policy.

3          The first location is the 2419 Long

4  Ridge Road address, the second location is the

5  1 Cooperfield Court address and the third

6  location is, it's Hudson, 2947 Hudson.  Oh

7  sorry, it's listed on the first page.  Are

8  those the three locations that are covered

9  under this policy?

10      A.    Yes, but you incorrectly labeled

11 location two and location three.

12      Q.    I'm sorry, okay.  So for the record,

13 let me make sure I've got it correct.  Location

14 one is 2419 Long Ridge Road, location two is

15 2947 Hudson Street and location three 1

16 Cooperfield Court, correct?

17      A.    Correct.

18      Q.    So the premium that we just talked

19 about of $8,948 for your homeowner's coverage

20 is the premium to insure all three of these

21 locations, correct?



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 14 of 98

JEFFREY B. COHEN                                    May 20, 2014
COHEN vs. BANKERS STANDARD                                 70

1       A.    Yes.

2       Q.    CMB1, LLC is -- has Hooligans and

3   GTSX, LLC as members?

4       A.    I think so.

5       Q.    Other than the $█████ that you said

6   you were paid by CMB1, LLC last month, have you

7   had any other income source in 2014?

8       A.    I think I got a residual check from

9   a life insurance policy that I sold years ago

10  for a small amount of money.  I think that's

11  it.

12      Q.    How much was the residual check?

13      A.    I think it was $█████, something

14  minimal.

15      Q.    What are you living on if you have

16  only made approximately $█████ in the past five

17  months?

18      A.    Savings.

19      Q.    What savings accounts do you have?

20      A.    What period of time?

21      Q.    From September 1, 2013 until the



1    paid you money?

2        A.    Because I think GTSX is the only

3    company that I filled out a -- I think it's a

4    B-9 maybe, new employee form.

5        Q.    Why did you fill out that form for

6    GTSX?

7        A.    Just proper procedure.

8        Q.    Are you an employee of that company?

9        A.    I believe so.

10       Q.    And as an employee, you've never

11   been paid anything?

12       A.    No.

13       Q.    Where were you employed prior to

14   GTSX, LLC?

15       A.    Indemnity Insurance Corporation.

16       Q.    What type of business was Indemnity?

17       A.    Insurance company.

18       Q.    What kind of insurance did it sell?

19       A.    Casualty insurance.

20       Q.    For what?

21       A.    For business.



1    Q.    What types of businesses?

2    A.    Entertainment related.

3    Q.    Bars, that sort of thing?

4    A.    Yes.

5    Q.    You created this company, correct?

6    A.    Yes.

7    Q.    When did you create it?

8    A.    The original creation of the idea

9  was I believe '98 or '99 and it's had various

10  corporate forms through the years.

11    Q.    What was the original name of

12  Indemnity?

13    A.    Capital Specialty.

14    Q.    What's the full name, full legal

15  name?

16    A.    Capital Specialty Insurance Limited.

17    Q.    And who are the principals of that

18  company when it was created?

19    A.    Myself and my parents.

20    Q.    What are your parents names?

21    A.    Neal Cohen, N-E-A-L, and Sandra



```
 1   weeks?

 2        A.    Yes.

 3        Q.    How much were you paid as an

 4   employee of Indemnity in the last -- in 2013?

 5        A.    My salary was, I think $▮▮▮▮▮▮▮,

 6   my base salary.

 7        Q.    Did you take any distributions?

 8        A.    I don't think, no, not from

 9   Indemnity.

10        Q.    Was that because the company was set

11   up in such a way so that it basically took a

12   loss every year so there were no distributions

13   to be made?

14        A.    I don't understand your question.

15        Q.    Did you not take any distributions

16   because there were no distributions to be made

17   because indemnity wasn't making a profit due to

18   the way it was set up?

19        A.    No, Indemnity made a profit every

20   year.

21        Q.    It did?
```



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 18 of 98

JEFFREY B. COHEN                                    May 20, 2014
COHEN vs. BANKERS STANDARD                                    79

1    well.  Do you have a question?

2        Q.    What do you contend that you're owed

3    in that litigation as a result of your

4    employment with Indemnity?

5        A.    I think it's in excess of 20

6    million, I don't remember the specific figure.

7              (Whereupon, Deposition Exhibit No. 4

8              was hereby marked for identification)

9    BY MS. ROSS:

10       Q.    I'm going to show you what I've

11   marked as Defendant's Exhibit No. 4.  This is a

12   letter from Indemnity to you dated September

13   12, 2013.  Is that right?

14       A.    Yes.

15       Q.    And in this letter you were

16   terminated by Indemnity, correct?

17       A.    Yes.

18       Q.    And you were terminated due to your

19   gross mismanagement of the company's

20   relationship with its regulators including

21   specifically your undisputed attempts to



1  provide fraudulent bank...

2            THE COURT REPORTER: Could you

3  please slow down a little?

4  BY MS. ROSS:

5      Q.    ....fraudulent bank confirmations to

6  the company's regulators and perhaps to

7  auditors as well, and your recent attempts to

8  drive a wedge between the companies management

9  and its employees and to damage it's

10 relationships with its agents and brokers.  Did

11 I read that correctly?

12     A.    Yes.

13     Q.    And is that the reason that you were

14 terminated from Indemnity?

15     A.    The document speaks for itself.

16     Q.    Is that the reason you were

17 terminated from Indemnity?

18     A.    No.

19     Q.    Based on the document that we're

20 looking at?

21     A.    I don't understand your question.



1      Q.    And of those companies, the only

2   company that has paid you any money over the

3   past two years is CMB1 that paid you the

4   $▬▬▬?

5      A.    Yes.

6            MS. MOSS:  Let's take a break.

7        (Whereupon, off the record)

8     (Whereupon, back on the record)

9   BY MS. MOSS:

10     Q.    Okay, so before the break we were

11  talking about some of the various entities that

12  you owned.

13           Have we talked about all of the

14  entities that you own as of today?

15     A.    I think so, I'd have to see a

16  corporate org chart because I've got a lot of

17  companies.

18           THE COURT REPORTER: Did you say

19  corporate order?

20           THE DEPONENT:  Corporate org,

21  O-R-G.



1   something that is owned by Risky Toyz, LLC?

2       A.      I don't remember if that was

3   disposed of or not, this was many years ago so

4   I don't remember.

5       Q.      When you say "many", how many years

6   ago?

7       A.      I think around 2010, 2009, 2010.

8       Q.      What type of aircraft?

9       A.      It was a Twin Piston 421.

10      Q.      When it was sold, did you receive

11  any proceeds from the sale?

12      A.      I don't think it was sold, it was

13  involved in a litigation with an employee of

14  mine that he owned the majority percentage.  We

15  as -- I think it was, I don't remember which

16  entity made a capital investment to buy it a

17  new engine so that became equity in the plane.

18      Q.      From the time that you were

19  terminated by Indemnity on September 12, 2013

20  through today, other than the $███ that we

21  talked about earlier that you've received as a

1   salary or as a payment, have you received any

2   other money from any of the other entities that

3   we just discussed?

4        A.    No.

5        Q.    So the only money that you've been

6   living on since that time is money from

7   investment savings and checking accounts?

8        A.    Yes.

9        Q.    You have not had any cash flow

10  whatsoever from outside entities other than the

11  $███████?

12       A.    Correct.

13       Q.    Is your insurance license still

14  active?

15       A.    Nope.

16       Q.    Why is your insurance license not

17  active anymore?

18       A.    Maryland took it away.

19       Q.    Why?

20       A.    Public documents speak for itself.

21       Q.    You tell me in your own words why it



1  was taken away.

2      A.    I can't, it's a litigated matter.

3      Q.    It's not a litigated matter.   Why

4  was your insurance license taken away by the

5  State of Maryland?

6      A.    It's a litigated matter.

7      Q.    Where is it being litigated?

8      A.    It's a pending litigated matter.

9      Q.    Where?

10     A.    Maryland.

11     Q.    What court?

12     A.    I'm not going to discuss it any

13  longer.

14     Q.    What's the style of the case?

15     A.    I'm not going to discuss it any

16  longer.

17     Q.    Sir you understand that your refusal

18  to answer a lot of these questions is not

19  proper.  And to the extent I go to the Court,

20  I'm going to have to call you back here to get

21  you to answer these questions.

Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 24 of 98

JEFFREY B. COHEN                                May 20, 2014
COHEN vs. BANKERS STANDARD                            123

1      A.      I disagree, I'm objecting to the

2   questions, they're not proper, they're not

3   relevant, they're dealing with other litigated

4   matters that I have certain confidentiality

5   provisions, therefore, they're not appropriate

6   to discuss.

7              (Whereupon, Deposition Exhibit No. 5

8              was hereby marked for identification)

9   BY MS. MOSS:

10      Q.      All right, well, I'm going to show

11   you what I have marked as Defendant's Exhibit

12   No. 5.  Is this a copy of the letter from the

13   Maryland Insurance Administration dated August

14   16, 2013, which is attached and Revocation

15   Order revoking your license to act an insurance

16   producer?

17      A.      Document speaks for itself.

18      Q.      Do you recognize this document to be

19   that?

20      A.      Yes.

21      Q.      All right, if you will, turn to Page



1  9 of this order.  Starting with the last line

2  of this Order, it says "the conduct of Cohen

3  violates the Insurance Article or another law

4  of this State that relates to insurance and

5  that he has misappropriated, converted or

6  unlawfully withheld money belonging to an

7  insurer, has committed fraudulent or dishonest

8  practices in the insurance business or has

9  willfully violated the Insurance Article or the

10  Insurance Regulatory Authority of another

11  State, has shown a lack of trustworthiness or

12  competence to act as an insurance produce, has

13  misappropriated or withheld unreasonably funds

14  received or held if the funds represent

15  premiums or return premiums and has conducted

16  business and accepted compensation for acting

17  as an insurance produce in this State without

18  having obtained a license and has conducted

19  business with an unlicensed business entity".

20  Do you see that?

21        A.    I do.

1      Q.     And are those the findings of the

2   Maryland Insurance Commissioner that

3   precipitated it to revoke your license as an

4   insurance producer?

5      A.       That's what the document says.

6           (Whereupon, Deposition Exhibit No. 6

7           was hereby marked for identification)

8   BY MS. MOSS:

9      Q.       I'm going to show you now what I

10   have marked as Defendant's Exhibit No. 6, this

11   is a letter dated August 16, 2013 from the

12   Maryland Insurance Commissioner to you,

13   Insurance Designers of Maryland, The Agency and

14   NI Agency and it includes an order of summary

15   suspension, suspending your insurance license,

16   is that correct?

17      A.     Yes.

18      Q.     And if you turn to Page 2 of this

19   order, Paragraph 3, are you with me?

20      A.     Yes.

21      Q.     It states, "Respondent's have



1  violated the Insurance Article or another law

2  of the State that relates to insurance as

3  specified in the Revocation Order and that

4  Respondent's have misappropriated, converted or

5  unlawfully withheld money belonging to an

6  insurer, committed fraudulent or dishonest

7  practices in the insurance business, willfully

8  violated a regulation of the commissioner or

9  the insurance regulatory authority of another

10 State, shown a lack of trustworthiness or

11 competence to act as an insurance producer,

12 misappropriated or withheld unreasonably funds

13 received or held if the funds represent

14 premiums on return premiums, conducted business

15 and accepted compensation for acting as an

16 insurance producer in the State without having

17 obtained a license and otherwise violated

18 Section 10-126 of the Insurance Article thereby

19 subjecting them to disciplinary action".  Did I

20 read that correctly?

21      A.    Yes.



1     Q.     And all of that relates to you and

2   these three companies that we just identified,

3   correct?

4     A.     This was a finding at the Maryland

5   Insurance Administration at which no evidence

6   was presented to refute what they found and

7   their finding was based on evidence given to

8   them by an unauthorized individual so that's

9   why this is going to be a pending litigated

10  matter.

11    Q.     You had an opportunity to present

12  evidence to Maryland Insurance Administration

13  on this matter, did you not?

14    A.     I did not.

15    Q.     In any event, this Order of Summary

16  Suspension ultimately caused your license to be

17  suspended based on the findings by the Maryland

18  Insurance Administration that I just read,

19  correct?

20    A.     Correct.

21



1  half before that, I don't remember the specific

2  date.

3      Q.    May 2012, does that sound right?

4      A.    Yes.

5      Q.    And when did you move out of this

6  home?

7      A.    I think it was September, end of

8  September, I think.

9      Q.    End of September of 2013?

10     A.    Yes.

11     Q.    Why were you moving out?

12     A.    Because we were going to be doing

13  renovations to the house and didn't want to

14  live there during the renovations and I was

15  going to use it as an office temporarily.  We

16  had our Long Ridge home that we were more

17  comfortable staying in during the renovations.

18     Q.    Why did the house need to be

19  renovated?

20     A.    Cause when we bought it, we bought

21  it as a house that we planned to do a lot of



1   changes with.

2       Q.     What were you doing as part of the

3   renovations?

4       A.     Changing most of the rooms, changing

5   stairwells.  I wouldn't say a complete gut job

6   but it was a pretty extensive remodeling.  Add

7   on to the garage, changing the front facade to

8   match a lot of remodeling.

9       Q.     And you said you were going to use

10  this an office temporarily?

11      A.     Correct.

12      Q.     Were you planning to use it as an

13  office during the renovation?

14      A.     Yes.

15      Q.     You physically were going to go in

16  and use it as an office?

17      A.     Yes, I was going to rent to one of

18  my employees and utilize it as an office in the

19  time being.

20      Q.     Why would you want to use an office

21  in a house that was being renovated?



1    company would be seized by the Department of

2    Delaware Insurance, did you?

3        A.    Anticipation no, but there were --

4    they had issued a voluntary supervision order

5    so it was a possibility at this point.

6        Q.    When was the voluntary supervision

7    order issued?

8        A.    Prior to July '12, so I think it was

9    April '12.

10       Q.    What makes you remember that date?

11       A.    I remember a meeting on July 2, I

12   think it was July 2 with the Department and we

13   were discussing the supervision order, which

14   would have been issued before that so I'm

15   assuming it was, I think it was around the

16   April time period.

17       Q.    When was the renovation on the

18   Cooperfield house supposed to start?

19       A.    I don't think we had an effective

20   date because we were still going through the

21   drawings.



1      A.    We were planning on changing the

2   driveway under one aspect of the drawings.  If

3   we had gone forward with that, we would have

4   needed zoning.

5      Q.    And does this neighborhood have a

6   Homeowners Association?

7      A.    It doesn't have a Homeowners

8   Association, it has a --  I forgot the term.

9   It's not a formal HOA, there's an architectural

10  committee.

11     Q.    And did you have to go before the

12  architectural committee to have any of the

13  changes or renovations approved?

14     A.    No, because I was unaware there was

15  on at this time.  There wasn't anything in any

16  of the settlement agreements or disclosure that

17  says there's anything about an architectural

18  committee.  We didn't know this until -- I

19  forgot the date, I put up a fence and I got a

20  letter saying it needed to be reviewed by the

21  architectural committee and realized that there



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 33 of 98

JEFFREY B. COHEN                                        May 20, 2014
COHEN vs. BANKERS STANDARD                                      152

1   was nothing disclosed as far as any kind of

2   body that it needed to be run by.  There was

3   going to be a whole litigation about that.

4       Q.    Was there litigation over that?

5       A.    The suit was -- the complaint was

6   drawn, I engaged -- the attorney is Matt Sturtz

7   with, I forgot the firm's name.

8           He made a demand to the title company

9   and demand to the title insurer to put a claim

10  in the title insurance because of the

11  non-disclosure.  They drafted the agreement, I

12  decided not to pursue it because it was a real

13  long shot to hold them couple for damages.

14      Q.    So now complaint was ever filed?

15      A.    Correct.

16      Q.    What was the cost of the renovation

17  going to be?

18      A.    I think the estimate was a million

19  to a million half.

20      Q.    Did you ever talk to the bank about

21  financing?



1       A.      Yes.

2       Q.      Which bank?

3       A.      Susquehanna.

4       Q.      Had you gotten a loan?

5       A.      I had gotten everything approved to

6   do -- I forgot the term they have, it's like a

7   builders loan, equity deal.  They're waiting on

8   the entire scope of services from the project

9   manager.

10       Q.      Were you planning to move back in

11   after the renovation?

12       A.      Yes.

13       Q.      You and your wife both?

14       A.      Yes.

15       Q.      Was somebody going to live in your

16   house during the renovation?

17       A.      That was the plan, I didn't think it

18   was the best plan but the individual that was

19   going to live there was okay with it.

20       Q.      Who was that individual?

21       A.      Jeff Duke.




1  during the training.

2       Q.    So was he just living in the house

3  temporarily then?

4       A.    No.

5       Q.    How long was the plan for him to

6  live in the Hudson Street house?

7       A.    It wasn't a plan.  I forgot the

8  terms of the lease for Hudson.

9       Q.    When did you engage movers to move

10 the items out of the Cooperfield Road house?

11      A.    I think August or September.  I

12 think August.

13      Q.    2013?

14      A.    Yes.

15      Q.    And did the movers get everything in

16 the house and move it all to the Long Ridge

17 Road address?

18      A.    No, there was a bunch of things left

19 that they missed.  And some things that they

20 can't transport.

21      Q.    How did they miss items?



1        A.    I don't understand the question.

2        Q.    Well, if you engaged them to move

3   everything in the home, how is it that they

4   didn't do that?

5        A.    They missed some items.

6        Q.    What did they miss?

7        A.    There was a bunch of boxes.  I

8   didn't have them do anything with my guitars or

9   my guitar equipment.  They missed -- there was

10  a couple closets with some things that they had

11  missed.  I don't know the specific items but

12  there was a few things they missed.  It's a big

13  house and they made multiple trips so they

14  missed a couple things.

15       Q.    So you specifically told them not to

16  move your guitars?

17       A.    Correct.

18       Q.    What was the name of the mover?

19       A.    Orley, O-R-L-E-Y.

20       Q.    Tell me what you had done on October

21  6, 2013.



1        A.      What I'd done?

2        Q.      Yes.

3        A.      Gone to the house in the morning

4    with my wife to start collecting some of the

5    items that they didn't get.  We packed

6    everything up in my truck and had a trailer.

7    Made a trip back to Long Ridge to unload it and

8    then I went back to Cooperfield to start

9    getting some of my guitar tools and some of the

10   guitars.  Returned back to Long Ridge and in

11   the afternoon is when I got the call that there

12   was a fire.  I went over to the house and

13   witnessed them putting the fire out.  Stuck

14   around to interview with the Fire Department

15   and there was all these mitigators that showed

16   up so then basically surveyed the house and

17   tried to close it up as much as we could.  Went

18   back to Long Ridge and called Ace to put the

19   claim in.

20        Q.      You called Ace on the day of the

21   fire?



1    Court?

2         A.    Fifteen, twenty minutes.

3         Q.    When you got to the Cooperfield

4    Court house, how did you enter the house?

5         A.    Garage door, garage door opener.

6         Q.    And the garage door has an opener?

7         A.    Yes.

8         Q.    And is there a door inside the

9    garage that leads to the house?

10        A.    Yes.

11        Q.    Is that door locked?

12        A.    No.

13        Q.    Is that the door that you use to

14   enter the house?

15        A.    If going through the garage, yes.

16        Q.    Was there a security system that you

17   had to turn off?

18        A.    I don't think we turned it on.

19   There was an alarm in the house, I don't think

20   we turned it on the last time we were there.

21        Q.    Why didn't you turn it on?



1        A.      Nothing out of the ordinary.

2        Q.      Did you do anything else while you

3    were at the house that morning?

4        A.      Scared away some turkey buzzards,

5    other than packing the truck.

6        Q.      And how did you do that?

7        A.      Through some firecrackers at them.

8        Q.      What kind of firecrackers?

9        A.      I forgot what they're called,

10   they're like a two inches, thin, kind of like a

11   -- they look like a Black Cat.  I don't

12   remember what the name of them were.

13       Q.      When you set off these firecrackers,

14   did they leave any debris?

15       A.      When they explode there's the paper

16   and the housing of the firecracker that

17   remains.

18       Q.      And did you pick up that paper and

19   housing?

20       A.      No.

21       Q.      What'd you do, just leave it there?



1    A.    Yeah, yes.

2    Q.    Where exactly did you set the

3  firecracker off?

4    A.    I threw them from the garage onto

5  the driveway and then threw from the corner of

6  the garage back towards where the HVAC was.  So

7  it's kind of like a crisscross.

8    Q.    So you threw two of these

9  firecrackers?

10    A.    I think it was like two or three, I

11  don't remember how many.  There was a whole

12  bunch of turkey buzzards so I'd always use

13  those to try to scare them away because we had

14  one that got caught in the chimney once and

15  made a mess.

16    Q.    And what does it do, just make a

17  loud noise and scares them?

18    A.    Yeah, just a big noise and scares

19  them away.

20    Q.    And you didn't pick up any of the

21  trash?



1      A.     What do you mean trash?

2      Q.     From the housing from the

3  firecrackers or any of the debris that would

4  have been left?

5      A.     No, I mean, it's -- from what I

6  recall from when I played around with these

7  before it's like a couple pieces of paper

8  remnant that blows away with the wind.

9      Q.     What did you do -- or let me ask you

10  this actually.  Did you do anything else while

11  you were at the house that morning?

12      A.     I mean, other than walking through

13  the house as typical.  Nothing else that can

14  point any direction other than just gathering

15  our stuff.

16      Q.     What time did you leave?

17      A.     We were probably there for an hour,

18  maybe an hour and half.

19      Q.     And what did you do when you left?

20      A.     Came back to Long Ridge, unpacked,

21  put mostly everything in the garage and then



1  Crystal wasn't feeling well, I think.  I think

2  she wasn't feeling well so I went back to get

3  the rest of the stuff guitars and tools and

4  stuff I wanted to move myself.

5      Q.     Did you go directly back after you

6  unpacked everything or did you do something in

7  between?

8      A.     I think I ate lunch at Long Ridge.

9  I think I did something for a brief period of

10  time before I returned to Cooperfield.

11      Q.     And what time did you leave for your

12  second visit back to Cooperfield for the day?

13      A.     I think it was early afternoon, I

14  don't remember the specific time.

15      Q.     What's early afternoon to you?

16      A.     Like between twelve and two-ish.

17      Q.     What kind of car were you in the

18  second time you went?

19      A.     Same car.

20      Q.     Did it have the trailer as well?

21      A.     Yes.



1      Q.    Do you own the trailer or rent it?

2      A.    I own it.

3      Q.    Did anyone else go to the house with

4 you?

5      A.    No.

6      Q.    What time did you arrive at the

7 Cooperfield Court house, the second time?

8      A.    Early afternoon.

9      Q.    That same 12:00 to 2:00 time period?

10     A.    I think so.

11     Q.    What did you do when you got the

12 Cooperfield Court house?

13     A.    Loaded the trash cans first, then

14 put a few guitars in the back seat, then

15 started grabbing some of the exotic woods and

16 guitar tools, manufacturing tools.  Just loaded

17 that up and returned to Long Ridge.

18     Q.    Did you pick up anything else other

19 than what you just told me?

20     A.    I may have grabbed different things

21 that were -- you know, maybe a box or



1     A.     They were stored in the basement of

2   Cooperfield.

3     Q.     Why'd you only take a couple of the

4   guitars?

5     A.     I took as many as could fit in the

6   back seat so they wouldn't be on top of each

7   other and scratch each other.

8     Q.     Did you do anything else at the

9   house the second time?

10    A.     I don't think so.  I can't remember.

11    Q.     Did you set off any firecrackers

12  again?

13    A.     I think I did.  I can't remember if

14  I threw three or four the first time or two and

15  two, I don't remember.  I think I did throw

16  some more because they had gone from the

17  chimney to the play set in the backyard.   I

18  think I did throw one or two more.

19    Q.     What kind of play set do you have in

20  your backyard?

21    A.     A swingset with swings and a slide



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 45 of 98

JEFFREY B. COHEN                           May 20, 2014
COHEN vs. BANKERS STANDARD                          179

1  moved in, somebody came over to introduce

2  themselves, I don't remember their names.

3  Crystal was on a mailing list with some of the

4  other houses in area but I never really

5  interacted with any of them.

6      Q.    So if Kristen Nause who says she is

7  one of your neighbors said that she saw you

8  leaving your driveway at 3:25, does that sound

9  about right to you?

10     A.    Yeah, I mean, it was the afternoon,

11 I don't remember the specific time but based on

12 the chronology yeah that would be no reason to

13 say no to that.

14     Q.    Leaving the house the second time is

15 what I'm talking about.

16     A.    Right, right.

17     Q.    So the only people you that you

18 talked -- the only person you talked to when

19 you went back the third time for the fire was

20 Detective Wilhelm?

21     A.    No, the Fire Department guys there



1  pulling down anything that could potentially be

2  burnt or -- I didn't see any bare flames when

3  we were there so it had already been doused.

4      Q.    So by the time you got there, there

5  were no flames?

6      A.    Lots of smoke, no I don't remember

7  seeing any flames.  I remember they punched

8  through one of the walls in the garage because

9  they thought that was a hot spot but I don't

10  recall seeing any flames.

11      Q.    Is Detective Wilhelm the only person

12  that you remember talking to that day by name?

13      A.    Correct.

14      Q.    And what was said between you and

15  Detective Wilhelm?

16      A.    He asked me a bunch of questions, I

17  asked him.  I don't remember any real specific

18  conversation.  He was inquiring if I knew

19  anything about it, whether we were living

20  there, what was in the garage but I don't

21  remember any specifics that I distinctively



1   discussed with him other than that.

2        Q.    And what did you tell him in

3   response to those questions?

4        A.    I told him we weren't living there,

5   told him that you know, we'd been there that

6   morning, I had just been there.  What I

7   remember was in the garage, I told them that I

8   thought it might have been the fridge because

9   we had some issues with fridge.  That's all I

10  remember from the conversation.

11       Q.    What were the issues you had with

12  the refrigerator?

13       A.    It was a fridge or freezer.  It was

14  a fridge.  The compressor kept, I don't know

15  technically what's wrong with it but it kept

16  over frosting and freezing up so we, I think we

17  had two or three service calls on it.  That's

18  when I told him that we had some issues with

19  it.

20       Q.    So you never had an electrical

21  problem with your refrigerator, did you?



1   assigned; I think it was the next day.

2       Q.     I understand there was a pretty

3   major stink bug infestation at the house at the

4   time of the fire?

5       A.     Not just the time of the fist when

6   we had a lot of stink bugs there.   The house

7   is out in the middle of the woods, Bad

8   stinkbug problem around Maryland.

9       Q.    How is it that these stinkbugs even

10  got into the house?

11      A.    I don't know, we had the property

12  sprayed, we had the -- I forgot what it's

13  called, the on the outside where the roof meets

14  the brick.   We had that sealed, we had most of

15  the window sealed.   We don't know how they were

16  coming in but they found a way.

17      Q.    Did you not try to clean them out?

18      A.    What do you mean?

19      Q.    Well, why did you clean out these

20  bugs when you were going over to the home?

21      A.    I don't understand, we had a



1  housekeeper regularly there to clean.

2      Q.    Well then how were -- how did the

3  bugs infest the home if you had a housekeeper

4  there cleaning.  Did she not sweep them up or

5  get them out of the house in some way?

6      A.    I don't know what she did because I

7  didn't watch, but we literally had probably

8  fifty stink bugs a day coming in the house.

9  It's a plague, there's nothing that kills them.

10 I bought every single pesticide known to man

11 that effects stink bugs but there's no known

12 enemy that's why there is significant problem

13 in Maryland right now, I think the whole

14 mid-Atlantic.  But that house particularly

15 because of where it was positioned in the woods

16 it just had, just got a ridiculous amount of

17 stink bugs that was a constant problem.  We had

18 a handheld vacuum in most rooms that we were in

19 because there were so many stink bugs and every

20 time you kill them it stinks so we use to have

21 to suck'em up and probably a dozen a day that

1    Q.    I'm going to show you what I've

2    marked as Defendant's Exhibit No. 9.  These are

3    records from Westminster Security Company.  Do

4    you see that?

5    A.    Yes.

6    Q.    If you turn to the third page, do

7    you see this letter?

8    A.    Yes.

9    Q.    It says "To who it may concern,

10   effective September 30, 2013, please cancel all

11   alarm service at 1 Cooperfield Court, Phoenix,

12   Maryland, 21131".

13   A.    Okay.

14   Q.    Did I read that correctly?

15   A.    Yes.

16   Q.    As you sit here today and are

17   testifying under oath, are you telling me that

18   you did not know that Crystal cancelled all

19   alarm service at 1 Cooperfield Court on

20   September 30, 2013?

21   A.    I don't remember.  I remember we had



1  discussions of what to do because the alarm

2  keeps going off.  I thought I had ripped the

3  wires out.  I don't remember her sending this,

4  we may've had the conversation but I don't

5  remember.

6      Q.    When you ripped the wires out, did

7  that disable the alarm system?

8      A.    It stopped the siren.  So I don't

9  know.  I actually ripped them out twice, we had

10  to repair them.

11      Q.    When did you rip the wires out?

12      A.    When we first moved in it was going

13  off in the middle of the night and nothing from

14  the keypad would turn it off so I went down and

15  just what I thought just grab the power and

16  ripped it out.  Then a...

17      Q.    And what was that date?

18      A.    I don't remember, it was shortly

19  after we moved into the house.

20      Q.    Okay, and they came and repaired

21  that?



1      A.    Yes.

2      Q.    All right, what was the second time

3   that you ripped the wires out?

4      A.    I don't know, Crystal would know

5   better than I did because she was mad at me for

6   doing it.

7      Q.    Was it around this time of September

8   30, 2013?

9      A.    No, it was I think it was several

10  months before that.

11     Q.    And was it ever repaired?

12     A.    Yes.  I think so.  I'm pretty sure

13  because she yelled at me because we had to pay

14  for it to be repaired twice.

15     Q.    So looking at this document showing

16  that the alarm service was cancelled on

17  September 30, 2013, you just do not recall

18  that?  Is that your testimony?

19     A.    Yeah, she sent this, I don't

20  remember it.  We may have had a discussion, I

21  may have said "hey, let's just cancel it" -- I



```
1    2013, do you recall that?

2         A.    Yes.

3         Q.    And were you present at that

4    inspection?

5         A.    Yes.

6         Q.    What was discussed?

7         A.    We walked through the house with

8    Mr. Everett and the mitigating company and

9    another individual, I don't recall the name.

10        Q.    David Maybe?

11        A.    No, he was from Accord.  There was

12   an independent that Mr. Everett brought.  We

13   walked through the house, assessed the damage,

14   spoke about what should be done right away,

15   what should be done subsequent.  Mr. Everett

16   authorized some specific payments that would be

17   made and authorized the mitigation to ensue.

18        Q.    And did you, at that time, talk to

19   Mr. Everett about your suspicion that this fire

20   may have started with the refrigerator in the

21   garage?
```



1    A.    Yes.

2    Q.    And do you recall telling him that

3  in your phone conversations that you had with

4  him on Tuesday, October 8 as well?

5    A.    I don't recall the conversation but

6  I remember telling Mr. Everett that one of the

7  ideas was from the fridge or the freezer.

8    Q.    One of the ideas, that was your

9  idea, correct?

10   A.    Correct.

11   Q.    No one else had told you that the

12  fire could have originated there?

13   A.    I believe that since this was so,

14  this was a couple days from the loss when I was

15  discussing it with, I think it was Detective

16  Wilhelm and other fireman on scene that it

17  possibly could be an electrical problem with

18  the fridge and they said that's very possible.

19  I don't think it was until after a subsequent

20  investigation that was, I think weeks after,

21  that they ruled out the fridge.

1        A.     I don't think so.

2        Q.     Next is cell phone, home telephone

3   statements showing outgoing and incoming calls

4   for September and October 2013.  Did you

5   provide that?

6        A.     I don't think so.

7        Q.     The next one asks for all documents

8   related to you financial condition as of

9   October 2013 and list some examples.  Did you

10  provide these?

11       A.     Yes.

12       Q.     You did not provide all documents

13  related to your financial condition though, did

14  you?

15       A.     I don't recall.  I sent several,

16  several hundred pages, so I don't recall the

17  specifics compared to that complex request.

18       Q.     We'll look at those in a minute.

19              The next question asks you to

20  provide a copy of data that could have been

21  maintained on any sort of personal financial



1   program.  Did you provide that to Bankers

2   Standard?

3        A.    No.

4        Q.    Do you maintain a personal financial

5   program such as Quicken or QuickBooks to

6   maintain your personal finances?

7        A.    Yes.

8        Q.    And why did you not produce that to

9   Bankers?

10       A.    I don't remember.

11       Q.    What personal financial program do

12  you use?

13       A.    QuickBooks.

14       Q.    Do you have an objection to

15  producing that information?

16       A.    Yes.

17       Q.    What is that?

18       A.    Relevancy.

19       Q.    Next question asks for Federal and

20  State tax returns for the calendar years 2011

21  and '12 including copies of you W-2's, did you



1      Q.    All right, I'm going to hand you a

2  copy of the email that I have marked as Exhibit

3  No. 17.

4           This is a copy of an email from you

5  to Tony -- or excuse me, to Corey Everett with

6  a copy to Tony Guerrierto and Mike Schwartz,

7  the date is Monday, October 28, 2013.  Is this

8  a true and correct copy of that email that you

9  sent on October 28?

10     A.     It appears to be, yes.

11     Q.     So in this email you write to

12  Mr. Everett and Mr. Guerrierto that "you're not

13  someone to permit two peon adjusters such as

14  yourselves to intimidate me".  Is that what you

15  wrote there?

16     A.     Document speaks for itself.

17     Q.     What would make you write that?

18     A.     I don't understand your question.

19     Q.     What would make you write something

20  calling someone else two peon adjusters?

21     A.     I don't understand your question.



1   an authorization allowing Ace to run a credit

2   report.   Did you ever sign that?

3        A.    No.

4        Q.    Why not?

5        A.    Because I objected to it.

6        Q.    Why did you object to it?

7        A.    Relevance to deal with the insurance

8   claim.   And I think because we had sent a copy

9   of a credit report that I had at the time.

10             (Whereupon, Deposition Exhibit No. 20

11             was hereby marked for identification)

12   BY MS. MOSS:

13        Q.    I'm going to show you a copy of

14   Exhibit No. 20.   This is an email from you to

15   me, on it you copy Corey Everett and Tony

16   Guerrierto.   The email is dated October 30,

17   2013.   Do you see that?

18        A.    Yes.

19        Q.    Is this a true, accurate, correct

20   copy of the email that you sent to me?

21        A.    Yes.



1      Q.    And you sent this to me after I sent

2  my letter to you on October 30, correct?

3      A.    Yes.

4      Q.    And in this email, you refer to my

5  "crack shot legal team at Cozen".  Am I reading

6  that correctly?

7      A.    Yes.

8      Q.    And what was your frame of mind when

9  you were writing that?

10     A.    I was paying you a compliment.

11     Q.    The "crack shot legal team" is a

12  compliment?

13     A.    I think so.

14     Q.    How is that a compliment?

15     A.    I think it's a compliment.

16     Q.    What does "crack shot legal team"

17  mean to you?

18     A.    Good legal team.

19     Q.    Why do you put crack shot in

20  quotations?

21     A.    I don't know.  That was the way to



1    Indemnity?

2         A.    There wasn't one.

3         Q.    Why not?

4         A.    Because Indemnity didn't become the

5    employee of record until 2012.

6         Q.    And how did that come about?

7         A.    I don't understand your question.

8         Q.    How did you come to become and

9    employee of Indemnity is 2012?

10        A.    I don't know how to answer that.

11   Indemnity became the employer of record and I

12   was the president of the company.

13        Q.    Looking at Cohen 6, this is one page

14   of what appears to be a ten page American

15   Express statement.  Am I correct in that?

16        A.    That's what it appears to be.

17        Q.    And why did you only provide one

18   page of this AMEX statement?

19        A.    I don't know.  I thought I sent the

20   whole thing.

21        Q.    The next page, which is Cohen 41, is



 1 otherwise be in violation of the Insurance

 2 Article".

 3         Did you understand that to be the

 4 Maryland Insurance Administration's finding

 5 with regard to your complaint?

 6     A.    Yes.   I also understand that there

 7 are hearing and appeal opportunities as a

 8 result of their finding.

 9     Q.    Are you planning to file an appeal?

10     A.    Possibly.

11         (Whereupon, Deposition Exhibit No. 26

12         Was hereby marked for identification)

13 BY MS. MOSS:

14     Q.    I'm going to show you what I have

15 marked at Exhibit No. 26.   This is an email

16 from you to me dated March 5, 2014 at 4:20

17 P.M., do you see that?

18     A.    Yes.

19     Q.    Is this a true and correct copy of

20 the email you sent to me?

21     A.    Yes.



1      Q.      And in the email you say that I am

2  "pathetic"?

3      A.      It says, "you are pathetic".

4      Q.      Yes.  Is that what you wrote?

5      A.      Yes.

6      Q.      Why did you write that?

7      A.      Because I think you're pathetic.

8      Q.      Do you think that this a respectful

9  way to talk to somebody?

10      A.      Objection to the question.

11      Q.      What's your objection?

12      A.      Leading.

13      Q.      That's not a leading question.  I'm

14  going to assume that your answer is no.

15          (Whereupon, Deposition Exhibit No. 27

16          was hereby marked for identification)

17  BY MS. MOSS:

18      Q.      I've just handed you what I've

19  marked...

20      A.      What did you just say; thank you.

21      Q.      I'm going to hand you what I've



1   renovation of the house?

2        A.     Because that work had been done when

3   we first moved in.

4        Q.     So did you have holes in your master

5   bathroom for that entire time period that you

6   had been living in the house?

7        A.     Yeah, we had holes all over the

8   house from a lot of the changes we were doing.

9   We didn't patch them up because we knew we were

10  going to rehab and no sense in patching up a

11  wall that was going to be changed anyways.

12       Q.     So you lived in the house for a year

13  with holes all throughout the house?

14       A.     Yes, over a year.

15       Q.     Were you aware that the Baltimore

16  County Police Department found toilet paper

17  wrapped around a PVC pipe inside the wall of

18  your bathroom?

19       A.     Yes, they didn't find that.  They

20  found a roll of toilet paper that had fallen

21  off a -- in the water closet in my bathroom,



1  there is a wall where half the wall is missing

2  because that's where the plumbing was replaced.

3  There was a roll of toilet paper that had

4  fallen behind the drywall.  When Detective

5  Wilhelm asked me about that, I told him that it

6  was candle mishap because there was a candle

7  sitting on the drywall that had fallen over.  I

8  didn't know there was a roll of toilet paper in

9  there but I guess the candle had burned it.  I

10  don't even remember the dates of that.

11       Q.    Were you aware that he did not find

12  any candle inside the drywall?

13       A.    Yes, because I picked up the candle.

14  When the candle fell over I grabbed it.  I

15  didn't realize that there was a roll of toilet

16  paper in this -- it's in between a wall so I

17  didn't realize that the toilet paper was in

18  there.

19       Q.    So what he found was not a roll of

20  toilet paper.  It was toilet paper wrapped

21  around a PVC pipe.  Do you know how it could



1   come to be that toilet paper was wrapped around

2   a PVC pipe?

3        A.    I don't believe that's what he

4   found.

5        Q.    But you're saying that this was a

6   candle that fell inside the wall and you were

7   there when this happened?

8        A.    Correct, it had happened months

9   before the fire, that I didn't remember the

10  specific date.

11       Q.    Do you know anything about the cost

12  to repair the damage to the home?

13       A.    I have an understanding of the

14  estimate.

15       Q.    What is your understanding?

16       A.    Several hundred thousand.

17       Q.    Several hundred, what is that 200,

18  300, 400?

19       A.    I think between 2 and 3.

20       Q.    And what is your understanding based

21  upon?



1   you have mentioned that you had some guitars

2   that were missing, at some point after the

3   fire, is that right?

4        A.    Right.

5        Q.    So the fire's -- excuse me.

6              The guitars were there on October 6

7   when you were there on the date of the fire,

8   right?

9        A.    Correct.

10       Q.    They were there on October 7,

11   correct?

12       A.    Yes.

13       Q.    When is the first time that you

14   realized that these guitars were missing?

15       A.    It was couple weeks later.  I'd have

16   to look at notes to remember what date.  I'd

17   stop by the house to see how the mitigation was

18   going and realized that half the wall where the

19   guitars were, were gone.  So that is when I

20   started asking questions of who had them.  I

21   thought they had been taken to be cleaned and



Case 1:14-cv-00313-JFM  Document 36-3  Filed 07/09/14  Page 67 of 98

JEFFREY B. COHEN                                    May 20, 2014
COHEN vs. BANKERS STANDARD                                299

1   found out that they had them.

2        Q.    So a couple of weeks after the fire

3   you're saying you realized that they were

4   missing?

5        A.    I don't remember the dates, it could

6   have been a week, two weeks. I'd have to look

7   at the notes.

8        Q.    At some point in October?

9        A.    Yes.

10       Q.    What kind of notes do you have?

11       A.    My notes from the claim' file.  Just

12   keeping notes as things have transpired.

13       Q.    It wasn't until December 17, 2013

14   that you submitted a claim to Ace with regard

15   to these missing guitars, right?

16       A.    I don't remember the date.  I went

17   and filed the police report which took a me a

18   little while to get to them and I think I filed

19   it after the police report.

20       Q.    So I'll represent to you that you

21   advised Ace of this claim on December 17, 2013.



1   Do you have any reason to dispute that?

2       A.    No, no I sat on it, it didn't move

3   quickly on it.

4       Q.    Why not?

5       A.    I think it took a period time, a

6   small period of figure out who had them and who

7   didn't have them, but I think just from a time

8   issue I didn't around to getting to the Police

9   Department for a while.

10      Q.    What have you done to try to locate

11  the guitars?

12      A.    Followed up with the Police

13  Department.  Went to three different pawn

14  stores it the area to look for them.  I'm

15  familiar with a lot of local musicians so I

16  told them, you know, the specific guitars that

17  were missing.

18          (Whereupon, Deposition Exhibit No. 31

19          was hereby marked for identification)

20  BY MS. MOSS:

21      Q.    I'll show you what I've marked as



1  Exhibit No. 31.  This is an email from you to

2  David Maybe with a copy to Corey Everett dated

3  November 11, 2013, is that right?

4      A.    Yes.

5      Q.    And is this a true and correct copy

6  of the email that you sent to Mr. Maybe?

7      A.    Yeah, it appears to be the email

8  string.

9      Q.    So this is an email string actually,

10  you're right, that relates to the missing

11  guitars and the last email in this string is

12  the one from you to Mr. Maybe saying that you

13  had found out that the guitars were removed by

14  the independent adjuster, correct?

15      A.    Correct.  And then there was a

16  subsequent correspondence saying that, that was

17  incorrect.

18      Q.    So who is the independent adjuster

19  that you're referring to?

20      A.    I was referring because Metro

21  Adjustment, Michael Schwartz, had thought that



1      Q.     And in that letter, the claim was

2  denied on the grounds that it appeared the

3  independent adjuster knew where the guitars

4  were?

5      A.     Correct, that's why I forwarded the

6  information after that showing that he didn't

7  know where it was.

8           (Whereupon, Deposition Exhibit No. 32

9           was hereby marked for identification)

10 BY MS. MOSS:

11     Q.     I'm going to show you now what I've

12 marked as Exhibit No. 32.  Is this a copy of

13 the email that you are referring to?

14     A.     Yes.

15     Q.     And in your letter, this a letter

16 from you to me dated February 25, 2014,

17 correct?

18     A.     Yes.

19     Q.     And does this appear to be a true

20 and accurate copy of your letter?

21     A.     Yes.



1    Q.    And you attached an email from Mike

2  Schwartzer to you?

3    A.    Yes.

4    Q.    And in the body of your letter you

5  said that you had forwarded this to

6  Mr. Everett?   This does not appear to be

7  forwarded to Mr. Everett.  This is just an

8  email between you and Mr. Schwartzer.

9    A.    This was the original email.  I had

10  forwarded this email to Mr. Schwartzer.

11  Attached is the original email.

12    Q.    What makes you think you forwarded

13  the email to Mr. Everett?

14    A.    I remember doing it.

15    Q.    You hadn't provided a copy of that

16  email to us, have you?

17    A.    I don't know.

18        (Whereupon, Deposition Exhibit No. 33

19        was hereby marked for identification)

20  BY MS. MOSS:

21    Q.    I'm going to show you what I've



1  marked as Exhibit No. 33. This is a letter from

2  me to you dated February 27, 2014, is that

3  right?

4      A.    Yes.

5      Q.    Do you recall receiving this letter?

6      A.    Yes.

7      Q.    And in that letter I asked that you

8  arrange a time for Bankers Standard to speak

9  with Mr. Schwartzer, didn't I?

10     A.    Say that again.

11     Q.    In this letter I asked that you

12 arrange a time for Bankers Standard to speak

13 with Mr. Schwartzer, didn't I?

14     A.    Yes, I recall seeing this.

15     Q.    Did you ever arrange a time for us

16 to do that?

17     A.    I didn't arrange a time, I don't

18 remember if I talked to him about this.

19     Q.    Why didn't you arrange a time for us

20 to talk with him?

21     A.    I don't remember.  Probably



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 73 of 98

JEFFREY B. COHEN                                    May 20, 2014
COHEN vs. BANKERS STANDARD                               308

1  because...I don't remember.

2      Q.    You never sat for an EUO with regard

3  to this claim, did you?

4      A.    You never scheduled one.

5      Q.    I requested some dates and...

6      A.    I gave you dates.

7      Q.    And I said those dates that were not

8  -- those were not dates that worked and you

9  never provided any additional dates, did you?

10     A.    Yes, I did.

11     Q.    You never sat for an EUO with regard

12  to the fire claim either, did you?

13     A.    You never scheduled one.

14         (Whereupon, Deposition Exhibit No. 34

15          was hereby marked for identification)

16  BY MS. MOSS:

17     Q.    I'm going to show you what I've

18  marked as Exhibit No. 34.  Is Exhibit No. 34 a

19  listing of the guitars that you contend are

20  missing as well as some pictures?

21     A.    Yeah.



1      Q.    What house is held by Nations Star

2  Mortgage?

3      A.    I think it's -- I think it's Hudson.

4  Nation Star has -- used to have two different

5  mortgages of mine, I think that's for Hudson.

6      Q.    And did you pay a payment late, in

7  September 2013?

8      A.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆.

9      Q.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

10 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

11 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

12     A.    ▆▆.

13     Q.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

14 ▆▆▆▆▆▆▆▆▆▆▆▆

15     A.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

16 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

17 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

18     Q.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

19 ▆▆▆▆▆▆▆▆

20     A.    ▆▆▆▆▆▆▆▆

21     Q.    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆





1

2      A.

3

4

5      Q.

6

7

8

9      A.

10

11      Q.    And is that because you are having

12 issues paying the mortgage on the Hudson home?

13      A.    No, no, it's a house that really I

14 have no benefit from owning any longer.  The

15 carry cost on it, it's not a -- it's not a

16 viable investment property any longer.  So when

17 I tried to call the bank to try to work out,

18 you know, some arrangement because I have

19 somebody who's willing to buy the house but the

20 appraisal value is almost half of what the note

21 is, so working with them to try to get a short

1        Q.     And when do you expect an outcome?

2        A.     Soon.

3        Q.     When's arbitration set?

4        A.     It's not appropriate to talk about

5    the matter.

6        Q.     Are you refusing to answer my

7    question?

8        A.     Yes.

9        Q.     Questions, I should say about this

10   issue?

11       A.     Yes.

12       Q.     So going back to my earlier

13   question, what would you estimate your monthly

14   income was prior to being terminated from

15   Indemnity?

16       A.     Asked and answered.

17       Q.     I know, but I don't think you ever

18   answered what you thought it was after we

19   identified the companies that were paying you

20   money.

21       A.     Somewhere between $▮▮▮▮▮ and



1   $███████.   No, I'm sorry, per pay period.

2        Q.    Every two weeks?

3        A.    Right, so it was about $██████████ a

4   month.

5        Q.    And what was your monthly income

6   after you were terminated from Indemnity?

7        A.    No more salary, so it was investment

8   income.   I don't know, I'd have to look.

9        Q.    $██████ to $██████ from investment

10  income?  Would it even be that much or less?

11       A.    That's probably fair to say.

12       Q.    Regardless, your income was

13  significantly less after you left Indemnity,

14  correct?

15       A.    Yes.

16       Q.    Did you decrease your spending after

17  you were terminated?

18       A.    If you take not paying for the

19  house, that was a decrease.   No real material

20  changes in spending.

21       Q.    When you say not paying for the



1  I think.   I don't remember when I opened the

2  other two.

3       Q.     And you also testified that you only

4  have $200 in an IRA account, is that right?

5       A.     No, it was $███████.

6       Q.     That's not what this transcript

7  says, does it?

8       A.     It says about 200, it doesn't say

9  $200. 200 meant $██████.

10       Q.     And you also testified that you had

11  a negative two-million dollar equity in all of

12  your houses, correct?

13       A.     Correct.

14       Q.     You said they were all under water,

15  right?

16       A.     Correct.

17       Q.     And is that true testimony?

18       A.     Delmar ended up not being, but the

19  rest of them were, yes.

20       Q.     You told the Court that you were not

21  in a financial position to pay the $500,000



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 79 of 98

JEFFREY B. COHEN                                    May 20, 2014
COHEN vs. BANKERS STANDARD                               328

1   bond, right?

2       A.     It wasn't a bond, it was a $500,000

3   sanction.

4       Q.     I'm sorry, I'm sorry, you're right.

5   You told the Court that you did not have the

6   $500,000 -- $500,000's to deposit into the

7   Court's registry, correct?

8       A.     Correct.  Myself personally in my

9   bank account, I did not.

10      Q.     You said you did not have money in

11  any of your bank accounts to pay that money,

12  did you not?

13      A.     It's not what I said.

14      Q.     Let's look back to Page 88,

15  "Question:  Mr. Cohen, there was a requirement

16  in the November 1 Sanctions Order that required

17  you place $500,000 into escrow with the

18  Register in Chancery.  Have you done that sir?

19  Answer:  No.  Question: Why haven't you done

20  that?  I don't have $500,000 to deposit into

21  the Court".



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 80 of 98

JEFFREY B. COHEN                                          May 20, 2014
COHEN vs. BANKERS STANDARD                                         329

1          Is that a true statement?

2     A.    Yes.   I didn't have $500,000 in my

3  personal bank account to deposit into the

4  Court.

5     Q.    Did you have it in any bank account?

6     A.    Sure, if I collected it all from

7  sold investments and used joint accounts I

8  could have come up with $500,000.

9     Q.    That's not what you said to the

10 Court that day is it?

11    A.    That's not what I was asked.

12    Q.    You said that the only way that you

13 could come up with that money was to sell your

14 interests in your company.

15    A.    The document -- objection because

16 the document speaks for itself.   If you're

17 going to mischaracterize the testimony, then

18 read the whole thing into the record.

19    Q.    The question that I'm trying to ask

20 you is, you told me that you were in a great

21 financial position in December 2013 but you're



1  telling the Court that you're not.  So which is

2  it?

3       A.    That's not what I told you, you're

4  mischaracterizing my testimony.  You're also

5  mischaracterizing the testimony of the Delaware

6  Chancery Court.

7       Q.    Well, the transcript will speak for

8  itself.

9       A.    It sure will.

10       Q.    Have you filed any sort of motion to

11  correct testimony or completed an audit sheet

12  or anything to that extent?

13       A.    Yes.

14       Q.    Oh, you have?

15       A.    Yes.

16       Q.    When was that?

17       A.    Rule 60B motion was filed, I don't

18  recall the specific date.

19       Q.    And has that been heard?

20       A.    No, it was -- it's on appeal because

21  it was -- wasn't heard.



1       Q.      Okay, we'll talk about those in a

2  minute.

3       A.      I'm going to show you what I've

4  marked as Exhibit No. 37.  What is this?

5       A.      Appears to be a residential dwelling

6  lease.

7       Q.      Between you and Indemnity Insurance

8  Corporation?

9       A.      Yes.

10      Q.      Was Indemnity paying you rent to

11 lease your property at Long Ridge Road?

12      A.      Yes.

13      Q.      Why is that?

14      A.      Because it was a vacant property and

15 I hired this individual as a CFO and part of

16 his compensation package was housing or a

17 house.

18      Q.      Well, you were living in that house,

19 right?

20      A.      No, I was living in Cooperfield.

21      Q.      Well, as of the date of this fire



1  you were living at Long Ridge Road, correct?

2      A.    Yes, we had moved out I think

3  September, end of September.

4      Q.    So this lease is from March 1, 2013

5  through February 28, 2015.  Were you living in

6  the house with David Kohler and his family?

7      A.    No, David Kohler was living there.

8  He vacated right around September.

9      Q.    And Indemnity was paying the rent on

10  Mr. Kohler's behalf?

11      A.    Yes.

12      Q.    Once you moved into the house, did

13  you expect that Indemnity was going to continue

14  to pay that rent?

15      A.    Yes.

16      Q.    Why is that?

17      A.    The term of the lease.

18      Q.    Except Mr. Kohler wasn't the one in

19  the house anymore, right?

20      A.    No term in the lease to give an

21  exception for that.





1      Q.     Are all your payments current on the

2   Long Ridge house?

3      A.     ▮▮▮▮

4      Q.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮

6      A.     ▮▮▮▮

7      Q.     Are all the taxes current on the

8   property?

9      A.     Yes.

10     Q.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13  ▮▮▮▮▮▮▮

14     A.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16     Q.     ▮▮▮▮▮▮▮▮▮▮▮

17     A.     ▮▮▮▮▮▮▮▮▮▮▮▮▮

18     Q.     Are all the payments current on the

19  Cooperfield Court house?

20     A.     ▮▮▮▮

21     Q.     ▮▮▮▮▮▮▮





1    A.    ████████████████████████████████████

2    ████████████████████

3    Q.    ████████████████████████████

4    ███████

5    A.    ██████████████████████████████████

6    ██████

7    Q.    ██████████████████████████████████

8    ████████████

9    A.    ██████████████████████████████████

10   ████████████████

11       Q.    Do you understand when you take a

12   mortgage out you have an obligation to pay the

13   bank for that mortgage?

14       A.    Yes.

15       Q.    And normally you do not take a Deed

16   in Lieu of foreclosure unless you are having

17   problems paying those payments.

18       A.    That's your point of view. █████████

19   ██████████████████████████████████████████████

20   ██████████████████████

21       Q.    ██████████████████████████████



1   ████████████

2       A.   ██████

3       Q.   ████████████████████████████████

4       A.   ████████████████████████████

5   ████████████████████████████████████

6       Q.   ██████████████████████████████

7   ██████████████████████████████████████████

8   ████████████████████████

9       A.   ██████████████████

10      Q.   ██████████████████████████████████

11  ██████████████████████████████████████████

12  ████████████████████████████████████

13  ██████████

14      A.   ████████████

15      Q.   Is Jeffrey Duke still living in the

16  Hudson Street house?

17      A.   Yes.

18      Q.   Is he paying you $1,000 a month

19  rent?

20      A.   Yes.

21      Q.   When is that supposed to end?



1  definitely didn't take a half hour to look at

2  the transcript and call the Court.

3      Q.    It probably did, we can -- I think I

4  might finish in 30 minutes, so we're probably

5  good with that.  We can address it if I don't.

6          (Whereupon, Deposition Exhibit No. 48

7          was hereby marked for identification)

8  BY MS. MOSS:

9      Q.    I'm going to show you now what I

10  have marked as Exhibit No. 48.  This is a copy

11  of a Consent Order that was entered in the

12  matter of the Maryland Insurance Administration

13  versus Insurance Designers of Maryland.  Do you

14  recognize this document?

15     A.    Yes.

16     Q.    And what was the nature of this

17  investigation?

18     A.    As a alternative risk company or

19  otherwise known as a captive, you have to put a

20  specific stamp on the declaration pages of a

21  policy and I believe there was five pages that



```
 1            (Whereupon, Deposition Exhibit No. 49

 2            was hereby marked for identification)

 3   BY MS. MOSS:

 4       Q.    I'm going to show you now what I

 5   have marked as Exhibit No. 49.  Is this a copy

 6   of the report on examination of Indemnity

 7   Insurance Corporation of D.C. that was

 8   performed by the Government of the District of

 9   Columbia Department of Insurance Securities and

10   Banking?

11       A.    Yes.

12       Q.    On Page 2 of this order...

13       A.    I'm going to object to the use of

14   this document.  This has to do with -- this is

15   a regulatory report for an insurance company

16   that's not involved in this litigation.

17       Q.    Are you refusing to answer questions

18   about this document?

19       A.    Nope.

20       Q.    Okay.  So if you look on Page 2 of

21   this document it indicates that there had been
```



1   a full scope examination of Indemnity which had

2   been previously known as Capital Specialty?

3        A.    Yes.

4        Q.    And on Page 2 they noted several

5   areas where the company had failed to comply

6   with previous recommendations, correct?

7        A.    Document speaks for itself.

8        Q.    If you look on Page 20 through 21,

9   you may recall this, if not we can look through

10  the document itself but in -- within this

11  document, the D.C. Department of Insurance

12  found that Indemnity wrote policies in excess

13  of limits approved by the D.C. Department of

14  Insurance, correct?

15       A.    Document speaks for itself.

16       Q.    It also found that Indemnity failed

17  to maintain reinsurance coverage on certain

18  policies?

19       A.    Document speaks for itself.

20       Q.    It also found that Indemnity

21  obtained a letter of credit in the amount of



1  $47 million dollars which expired on December

2  31, 2009 but the company did not record the

3  letter of credit on its quarterly financial

4  statement until the D.C. Department of

5  Insurance required it to do so?

6       A.    Do you have a question?

7       Q.    Is that correct that, that was the

8  finding of the D.C. Department of Insurance?

9       A.    Document speaks for itself.

10 Document also doesn't have any penalty or fines

11 or material change to any of the equity or

12 income statements of the companies.

13      Q.    The D.C. Department of Insurance

14 also found that Indemnity collected membership

15 fees from its insured's which should have been

16 remitted to the International Association of

17 Entertainment Businesses, Inc. but it failed to

18 do so, correct?

19      A.    Yes, in the amount of, I believe it

20 was $1,800 at the time.

21



1          (Whereupon, Deposition Exhibit No. 50

2          was hereby marked for identification)

3     BY MS. MOSS:

4          Q.     Let me show you what I have now

5     marked as Defendant's Exhibit No. 50.   Does

6     this appear to be a true and correct copy of

7     the order imposing sanctions against you in the

8     State of Delaware action, Civil Action No.

9     8601-BCL?

10         A.     Appears to be.

11         Q.     In this order the Court ordered that

12    you place $100,000 in escrow, is that correct?

13         A.     Correct.

14         Q.     You have now forfeited that amount,

15    is that right?

16         A.     I don't believe I forfeited, the

17    Court ordered it to be paid to Indemnity.

18         Q.     Due to sanctions -- I mean, due to

19    your behavior?

20         A.     Objection to all the documents that

21    have nothing to do with Jeff Cohen personally,



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 92 of 98

JEFFREY B. COHEN                                    May 20, 2014
COHEN vs. BANKERS STANDARD                               361

1  these have to with corporate regulatory

2  matters.  If you'd like to use them, then go

3  ahead and ask your questions but I object to

4  the use of these documents and a lot of them

5  actually have privileged information.

6          (Whereupon, Deposition Exhibit No. 51

7          was hereby marked for identification)

8  BY MS. MOSS:

9     Q.    All right, all I'm showing you is a

10 public version of the document.  What I've just

11 handed you is Exhibit No. 51, does this appear

12 to be a true, accurate and correct copy of the

13 order imposing additional sanctions dated

14 November 1, 2013?

15    A.    Yes.

16    Q.    And in this order the Court required

17 you to post an additional security of $500,000?

18    A.    Correct.

19    Q.    And you have not paid this, right?

20    A.    The sanctions fines have been

21 stayed, so no I haven't paid it.



1      Q.    Why do you say the sanctions fines

2  have been stayed?

3      A.    Because they have.

4      Q.    By whom?

5      A.    Vice Chancellor Laster.

6      Q.    Why were they stayed?

7      A.    Ask him.

8          (Whereupon, Deposition Exhibit No. 52

9          was hereby marked for identification)

10  BY MS. MOSS:

11     Q.    All right, I'm going to show you

12  what I have marked as Defendant's Exhibit No.

13  52.  Is this a true, accurate and correct copy

14  of the memorandum opinion issued by the Court

15  on January 2, 2014?

16     A.    I don't know, I'd have to read it

17  word for word.

18     Q.    Okay, you want to flip through it

19  and see if it looks like a copy of that?

20     A.    Well, you have fifteen minutes left,

21  would you like to spend reading this to affirm



Case 1:14-cv-00313-JFM   Document 36-3   Filed 07/09/14   Page 94 of 98

JEFFREY B. COHEN                                    May 20, 2014
COHEN vs. BANKERS STANDARD                                    363

1  that?

2     Q.     Looking through the document, does

3  it appear to be a copy of that order?

4     A.     Appears to be.

5     Q.     Looking at Page 2 of this order,

6  maybe not -- and to Page 3, it says that on

7  July 26, 2013, the commissioner filed a

8  Verified Petition for Entry of Liquidation and

9  ultimately sought authority to liquidate

10  Indemnity in light of acts of fraud by Cohen

11  and Indemnity's unsound financial condition.

12  The Court found that you had acted

13  fraudulently, right?

14     A.     No.  This is a Supreme Court opinion

15  it is a opine on two specific -- I'm sorry

16  three specific appeals having to do with due

17  process violations.  This is not a finding of

18  fact of fraud.  They're opining on the trial

19  court documents and orders.  There hasn't been

20  a finding of fraud, there has been a ex-parte

21  petition to cease Indemnity Insurance Company



1  based on allegations of fraud.  There has not

2  been any finding a fact as to fraud.

3       Q.    All right, well let me ask you this,

4  I'm assuming that you don't agree with all the

5  findings contained in Exhibit No. 52, is that

6  fair to say?

7       A.    Correct.

8       Q.    Regardless of whether you agree with

9  the findings, the Delaware Chancery Court had

10 an opportunity to hear all the evidence

11 presented...

12      A.    That's not correct.

13      Q.    ...on both sides of the hearing...

14      A.    That's absolutely not correct.

15      Q.    Let me finish my question.

16            The Delaware Chancery Court heard

17 all the evidence that was presented at the

18 hearing, considered the evidence and arguments

19 and ultimately issued this Order, correct?

20      A.    You're incorrect.  The Chancery

21 Court did not issue this Order, the Chancery



1   Court did not provide ample opportunity to

2   provide evidence to refute the allegations.

3   This is a Supreme Court Order opining on three

4   specific appeals that did not have anything to

5   do with fraud or evidence of fraud.

6        Q.     This is a Court of Chancery of the

7   State of Delaware Memorandum Opinion.  This is

8   not a Supreme Court opinion.

9        A.     I'm sorry, I thought this was a

10  Supreme Court, you're correct.

11       Q.     Okay.  So regardless of whether you

12  agree with the findings, the Delaware Chancery

13  Court did hear all the evidence that were

14  represented by both sides the hearing which you

15  attended and testified at, correct?

16       A.     You're incorrect.  This covers a

17  period of time over several hearings of which I

18  was only present at one and as the other

19  documents filed in this matter show that the

20  Judge did not give the opportunity for evidence

21  to be submitted to refute the allegations.

1    Q.    To the extent that you didn't appear

2  at those hearings, it was not -- it was at your

3  own accord of not attending.

4    A.    I'm going to object to this line of

5  questioning as harassing the witness.  It has

6  nothing to do with the matter at hand, continue

7  at your risk.

8    Q.    At the end of the day the Memorandum

9  Opinion was issued by the Court, correct?

10    A.    Correct.

11    Q.    And you did appeal of these

12  sanctions orders to the Supreme Court of

13  Delaware, correct?

14    A.    Incorrect.

15    Q.    What's incorrect about that?

16    A.    I didn't appeal all the sanction

17  orders to the Supreme Court.

18    Q.    Which ones did you appeal?

19    A.    I'd have to check the records, there

20  was three specific original appeals and now

21  there's three additional appeals.



1          (Whereupon, Deposition Exhibit No. 53

2          was hereby marked for identification)

3  BY MS. MOSS:

4     Q.    And I've just handed you Exhibit No.

5  53, is this a copy of the Opinion issued by the

6  Supreme Court of Delaware?

7     A.    Yes.

8     Q.    This is a 52 page Opinion that was

9  issued on April 9, 2014, correct?

10    A.    Yes.

11    Q.    And although you may disagree with

12  some of these findings, this was what the

13  Supreme Court of Delaware ultimately decided

14  after looking at the evidence?

15    A.    Yes.

16    Q.    Have you received any inheritances

17  in the last two years?

18    A.    No.

19    Q.    Have you told me about all sources

20  and amounts of income on the time of loss?

21    A.    I've answered all your questions, I

